1

2

3

4                        UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF WASHINGTON
5                                  AT TACOMA

6    LENIER AYERS,

7                              Plaintiff,        No. C08-5541 RJB/KLS

8         v.                                     **REPORT AND RECOMMENDATION**
                                                 **Noted for:  June 2, 2010**
9    HENRY RICHARDS, et al.,

10                            Defendants.

11         Before the Court is the motion for summary judgment of Defendants Thomas Bell, Becky

12   Denny, Jeremy Dorfner, Jose Garcia, Mike Hogan, Henry Richards, Ph.D., Richard Steinbach,

13   and Leslie Szierbert, M.D. ("Defendants" or collectively "SCC")[1].  Dkt. 50.  Plaintiff Lenier

14   Ayers has filed a "declaration in opposition" (Dkt. 61) and Brief of Declaratory Evidence (Dkt.

15   66).  Defendants filed a reply.  Dkt. 64.[2]  Having carefully reviewed the motion and balance of

16   the record, and viewing the evidence in the light most favorable to Mr. Ayers, the undersigned

17   recommends that the Defendants' motion for summary judgment be granted, in part.

18

19                                  *SUMMARY OF CASE*

20         In his First Amended Complaint, Mr. Ayers sets forth eighteen separate claims as the

21   incidents forming the basis of his complaint.   These include claims that SCC employees have

22   assaulted him, used excessive force and denied him medical care.  Defendants move for

23

24   _____
     [1] Plaintiff also named SCC staff member Carla Jones and Krystal Wittala Knutson as defendants in his First
25   Amended Complaint, but neither have been served.

26   [2] On January 12, 2010, the court granted Mr. Ayers's request for an extension of time to file his summary judgment
     evidence until February 22, 2010 and re-noted the Defendants' summary judgment motion for February 6, 2010.
     Dkt. 67.

REPORT AND RECOMMENDATION - 1

summary judgment on some of these claims, including (1) excessive force (January 17, 2006) by Defendants Dorfner and Hogan; (2) bringing a false assault charge (June 1, 2008) by Defendant Garcia; (3) excessive force on August 8, 2008 by Defendant Steinbach; (4) removal of blankets by Defendant Steinbach; (5) verbal harassment and "deliberate infuriation" by Defendants Dorfner, Hogan, Garcia and Steinbach; (6) damage claims against Defendants in their official capacities; and (7) allegations against Defendants under Washington's Public Disclosure and Abuse of Vulnerable Adults Acts.

Defendants also move for summary judgment in favor of Defendants Bell, Sziebert, and Richards on various claims by Mr. Ayers as to denial of medical care, conditions of SCC's Intensive Management Unit, and Defendant Richards' failure to intervene.  The relevant facts, the court's legal analysis and conclusion are set forth under each heading dealing separately with the claims at issue.

*SUMMARY JUDGMENT STANDARD*

Summary judgment will be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 5(c).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those positions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  *Celotext Copr. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  *Calderone v. United States*, 788 F.2d 254, 259 (6th Cir. 1986).  On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support

REPORT AND RECOMMENDATION - 2

the non-moving party's case. *Catrett*, 477 U.S. at 325.  If the moving party meets its initial

burden, the opposing party must then set forth specific facts showing that there is some genuine

issue for trial in order to defeat the motion.  *Anderson v. Liberty Loby*, 477 U.S. 242, 250, 106

S.Ct. 2502, 91 L.Ed.2d 202 (1986).

"To survive summary judgment, a party does not necessarily have to produce evidence in

a form that would be admissible at trial, as long as the party satisfies the requirements of Federal

Rules of Civil Procedure 56."  *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir.2001).

Rule 56(e) "requires that affidavits submitted in support of a motion for summary judgment

must: (1) be made on the personal knowledge of an affiant who is competent to testify to the

matter stated therein, (2) must state facts that would be admissible in evidence, and (3) if the

affidavit refers to any document or item, a sworn or certified copy of that document or item must

be attached to the affidavit."  *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1023  (N.D.

Cal.2006) (citations omitted).  Thus, "[a] declarant must show personal knowledge and

competency to testify [as to] the facts stated."  *Id.* (citing *Bank Melli Iran v. Pahlavi*, 58 F.3d

1406, 1412 (9th Cir.1995)).  In other words, "[t]he matters must be known to the declarant

personally, as distinguished from matters of opinion or hearsay" as "[a] declarant's mere

assertions that he or she possesses personal knowledge and competency to testify are not

sufficient."  *Id.* (citing *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999 (9th Cir.1990)).

"Rather, in accordance with Rule 56(e), a declarant must show personal knowledge and

competency "'affirmatively,' ... for example, by the nature of the declarant's position and nature

of participation in [the] matter.'"  *Harris Technical Sales, Inc. v. Eagle Test Systems, Inc.*, 2008

WL 343260, at *2 (D.Ariz.2008) (quoting *Boyd*, 458 F.Supp.2d at 1023).

REPORT AND RECOMMENDATION - 3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

        In this regard, the court notes that Defendants submitted the Declaration of Becky Denny to which are attached investigative records, incident reports and administrative review findings relating to various incidents at issue.  However, Ms. Denny is not competent to testify as to the contents of any such records attached to her declaration.  In accordance with Rule 56(e), a declarant must show personal knowledge and competency "'affirmatively,' ... for example, by the nature of the declarant's position and nature of participation in [the] matter.'"  See, e.g., *Harris Technical*, 2008 WL 343260, at *2 (quoting *Boyd*, 458 F.Supp.2d at 1023).

        Mr. Ayers submitted over 400 pages of "evidence" in opposition to Defendants' motion for summary judgment.  Dkt. 66.  The documents are unorganized and consist largely of Mr. Ayers's handwritten restatements of his claims.  Also included are grievances, correspondence and memoranda.  Although the majority of the material submitted by Mr. Ayers is not in admissible form, the court has reviewed the documents and wherever possible, refers to and discusses those materials as they may relate to Mr. Ayers's specific claims at issue in this motion.  See, e.g., *Jonas v. Blanas,* 393 F.3d 981, 923 (9th Cir. 2004) (internal citations omitted)(the court must consider as pro se litigant's evidence in opposition to summary judgment all of his contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where attested to under penalty of perjury).  See also, *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir.2001) (To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Fed.R.Civ.P. 56).

REPORT AND RECOMMENDATION - 4

1    The court also notes that Mr. Ayers references other issues in the 400 pages.  However,

2    the only claims before the court are those specifically identified in the Plaintiff's First Amended

3    Complaint.

4    **A.    THE JANUARY 17, 2006 INCIDENT: EIGHTH AMENDMENT CLAMS OF**
     **ASSAULT BY DORFNER AND HOGAN**

5

6    Mr. Ayers alleges that he was assaulted by Jeremy Dorfner and Mike Hogan in violation

7    of his Eighth Amendment right to be free from cruel and unusual punishment.  The undersigned

8    will first address the constutitional analysis before presenting the facts, as the facts are somewhat

9    lengthy and involved.

10

11   **(1)    Constitutional Analysis**

12   The rights of one who is civilly committed are analyzed using the same standards that

13   apply to pretrial detainees.  *Jones v. Blanas*, 393 F.3d 918, 931-32 (9th Cir. 2004).  "What is

14   necessary to show sufficient harm for purposes of the Cruel and Unusual Punishments Clause [of

15   the Eighth Amendment] depends upon the claim at issue ...."  *Hudson v. McMillian*, 503 U.S. 1, 8

16   (1992).  "The objective component of an Eighth Amendment claim is ... contextual and

17   responsive to contemporary standards of decency."  *Id*. (internal quotation marks and citations

18   omitted).  The malicious and sadistic use of force to cause harm always violates contemporary

19   standards of decency, regardless of whether or not significant injury is evident. *Id*. at 9; see also

20   *Oliver v. Keller*, 289 F.3d 623, 628 (9th Cir.2002) (Eighth Amendment excessive force standard

21   examines *de minimis* uses of force, not *de minimis* injuries)).  However, not "every malevolent

22   touch by a prison guard gives rise to a federal cause of action."  *Hudson*, 503 U.S. at 9.  "The

23   Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from

24   constitutional recognition *de minimis* uses of physical force, provided that the use of force is not

25

26

REPORT AND RECOMMENDATION - 5

of a sort repugnant to the conscience of mankind."  *Id*. at 9-10 (internal quotations marks and citations omitted).

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Id*. at 7.  "In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response."  *Id*. (internal quotation marks and citations omitted).  "The absence of serious injury is ... relevant to the Eighth Amendment inquiry, but does not end it."  *Id*.

### (2)    Facts and Evidence Presented

Plaintiff asserts that on January 17, 2006, Defendant "Jeremy Dorfner and Mike Hogan violently used excessive force against [him], resulting in [his] being injuriously struck in the ribcage by Defendant Hogan."  Dkt. 15, p. 6, ¶ 9.  Mr. Ayers also asserts that Defendant Dorfner "continuously assaulted [plaintiff] while [he] lay on the floor in submission."  *Id*. at 10.

Defendants Jeremy Dorfner and Mike Hogan are SCC staff members whose duties include interacting with SCC residents on a regular basis, assisting residents in maintaining pro-social behavior, providing redirection to residents displaying behavioral dyscontrol, documenting contacts with residents, and assisting residents to move to less stimulating environments within the facility when overstimulation threatens the safety and security of the facility, staff, other residents, or residents experiencing behavioral dyscontrol.  Dkt. 52, ¶ 2.

REPORT AND RECOMMENDATION - 6

Mr. Ayers has always admitted that he struck Mr. Dorfner.  In his "Brief of Declaratory Evidence," Mr. Ayers provides the following explanation:

> In the requested video I am seen innocently minding my own business, never having posed any type of questionable act or rule violation.  I had been standing at the drinking fountain filling my water container.  Dorfner is then witnessed approaching me from behind, and speaking in a loud tone of voice as if to startle me, "How are you, Mr. Ayers"!  Knowing, he was doing this to harass me, and without turning around, I asked him, "How's yo' momma?"  This statement angered him and he began to give me the directive repeatedly to, "Return to your unit!"  He then continued to badger and verbally harass me.  Still not turning around or looking at him, I continued to fill my container as I began to tell him to, "Leave me alone!"  Dorfner persisted to coercively agitate and annoy this writer in this manner to purposely exacerbate the reported conflict situation which precipitated the verbal and physical altercation.  I open-handedly smacked Dorfner, which was more to humiliate him then to hurt him, in an effort to stop his harassment, and was headed in the direction of the weight room to gather my belongings to comply with his demand when Mike Hogan punched me in my right rib.  Once on the gym floor, Dorfner tried to pound my head on the floor six times and when I resisted, he dropped his knee down onto my head twice, causing me to have a gigantic headache and having to go to the doctor.  This was witnessed by two detainees and happened as RRC, Pete Robinson stood watching.  I was then hand-cuffed and placed in the IMU unit."

Dkt. 66-2, p. 19 (CM-ECF numbering).

In another account of the incident, Mr. Ayers states:

> I then tap him on the chin.  He then cowers behind another male staffmember.  At which time I am struck in my rib cage by another staff person named Mike Hogan.  I then drop to the floor in submission in a non-resistant non-combative take-down.  RRC Dorfner then proceeds to put hands on, and violently attacks this writer.  Mr. Dorfner staged, and exploited this abusive situation that he initiated to collect L&I pay even though he was not injured.

Dkt. 66-4, p. 1.

In his declaration, Mr. Ayers states that after he had already "compliantly laid down on the floor, been placed in handcuffs behind [his] back," Defendant Dorfner went into a "temper tantrum and began trying to slam [his] face into the floor followed by several knee drops to [his] left temple as [he] compliantly laid on the floor."  Dkt. 61, p. 3.

REPORT AND RECOMMENDATION - 7

Mr. Ayers asserts that the video confirms his version of events (Dkt. 66-4) but also alleges that to the extent his rendition of the facts is contrary to what is displayed on the security video, either the film was edited to exclude Mr. Dorfner's acts or the cameras were not filming during Mr. Dorfner's acts.  Dkt. 61, p.3.  The undersigned notes, however, that Mr. Ayers has presented no evidence upon which to base a conclusion that the film was edited or changed in any fashion.

With regard to Defendant Hogan, Mr. Ayers makes several contradictory statements.  In his declaration he states that during the January 17, 2006 assault, Defendant Hogan:

> [B]lindsidedly [sic] rushed up to my right side, and struck a sharp blow to my right ribcage as I was compliantly submitting to the reported takedown, he was conscious of the fact that I was'nt [sic] making any attempt at resisting the said takedown.

Dkt. 61, p. 3.

In his brief in opposition, Mr. Ayers states:

> I open-handedly smacked Dorfner, which was more to humiliate him then to hurt him, in an effort to stop his harassment, and *was headed in the direction of the weight room to gather my belongings to comply with his demand when Mike Hogan punched me in my right rib.*

Dkt. 66-2, p. 19 (emphasis added).

Mr. Ayers submitted a statement of SCC resident Tommy Coleman (SCC #490249), who states that he saw Mr. Ayers arguing with recreation staff Jeremy in front of the weight room door.  Dkt. 66-5, p. 2.  Mr. Coleman states that Mr. Ayers attempted to leave, but Jeremy stepped in front of Mr. Ayers to keep him from passing.  *Id.*  He also states that Defendant Hogan threw Mr. Ayers to the ground, that Defendant Dorfner then grabbed and punched Mr. Ayers to the ground where Defendant Dorfner continued to punch Mr. Ayers and drop his knee onto Mr. Ayers' head.  *Id.*

REPORT AND RECOMMENDATION - 8

Included in Mr. Ayers's documents is a DOC Primary Encounter Report reflecting that on January 19, 2006, he was issued a re-usable cold/hot pack and instructed to take Tylenol for the next 2 to 3 days. Dkt. 66-2, p. 28. A report by B. Boardman, ARNP, dated January 20, 2006, indicates that Mr. Ayers complained of rib pain from an altercation of two nights previous. Dkt. 66-5, p. 28. The notation further indicates that Mr. Ayers had some tenderness, but not ecchymosis, erythema or induration. *Id.*

In support of their motion, Defendants attach surveillance videos of the January 17, 2006 incident (Dkt. 52-2, Attachs. A and B), the declaration of Jeremy Dorfner and the declaration of Mike Hogan. Dkts. 54 and 55.

Defendants also provide their summary of the contents of the surveillance video. Dkt. 50, p. 4. For purposes of this motion, the court relies on its own review of the surveillance tape. Becky Denny identified the three parties shown in the video in her declaration. Dkt. 52. In that regard, Mr. Dorfner is shown in the video wearing a plaid shirt, the plaintiff is wearing a white t-shirt, and Mike Hogan is wearing the green jacket.

In his declaration, Defendant Dorfner states that it has never been his motivation or intention to intentionally harass resident Lenier Ayers or to provoke resident Ayers into behavior with the intent to engage in a physical confrontation or to provide an excuse to create negative behavioral or incident reports about him. Dkt. 54, p. 2. Defendant Hogan states the same. Dkt. 55, p. 2. Defendant Hogan also states that, with regard to the February 17, 2006 incident in which resident Ayers attacked SCC staff member Jeremy Dorfner, that he used the amount of force he believed was necessary under the circumstances to restrain resident Ayers until his fellow staff and he could put handcuffs on Mr. Ayers. *Id.* He states further that he based the amount of force necessary on his observation of resident Ayers attacking Mr. Dorfner, and the

REPORT AND RECOMMENDATION - 9

amount of resistance Mr. Ayers put up before Mr. Hogan and his colleagues could restrain Mr. Ayers safely.  *Id.*

In her declaration, Becky Denny, a legal coordinator at SCC, attests that the copies of the surveillance videos to the court are true and correct recordings captured from surveillance cameras within SCC.  Dkt. 52, p. 2.  She also provides copies of the investigative records regarding the January 17, 2006 incident.  *Id.*, Exh. C.   From these documents, it may be concluded that an investigation was conducted by an SCC Investigator Darold Weeks, who concluded that Mr. Ayers's claims of abuse were false.[3]  *Id.*

Mr. Ayers's description of the January 17, 2006 incident[4] is dramatically different from what is depicted on SCC's security videos.   "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686, ---- (2007).  In *Scott* the plaintiff's description of his attempt to flee from police and his description of the facts of the police chase were dramatically different from, and completely contradicted by, a videotaped recording of the police chase.  *Id*. 127 S.Ct. at 1775.  Although a court is required to view facts in the light most favorable to the non-moving party with respect to a summary judgment motion, that standard applies "only if there is a 'genuine' dispute as to [the] facts."  *Id*. 127 S.Ct. at 1776.  In light of the videotape in *Scott*, the plaintiff's unsupported version of the facts could not legitimately create a genuine issue of material fact. Therefore, the Supreme Court

---

[3] In his investigation report, Mr. Weeks refers to Incident #06-247 as having occurred on February 17, 2006. However, the surveillance video confirms that the incident occurred on January 17, 2006.

[4] Mr. Ayers refers to the "February 17, 2006" incident, but the actual date was January 17, 2006.

REPORT AND RECOMMENDATION - 10

1    concluded the court should not adopt a plaintiff's version of events that is clearly contradicted by

2    the record before the court on summary judgment.  *Id*. 127 S.Ct. at 1776

3        The surveillance videos contain no audio.  Thus, any issues of what was said and by

4    whom cannot be resolved by reviewing the surveillance videos alone.  Defendants have offered

5    no evidence contradicting Mr. Ayers's allegations of what was said and by whom.  Thus, for

6    purposes of this summary judgment motion, the court must accept Mr. Ayers's version of what

7    was said but must also rely on its own review of the surveillance videos.  (Dkt. 57, Attach. A and

8    B)

9        The court's review of the first surveillance videos (Attach. A) of the January 17, 2006

10   incident shows Mr. Dorfner saying something to Mr. Ayers as Mr. Ayers is walking by.  Mr.

11   Ayers then turns and aggressively approaches Mr. Dorfner.    Mr. Ayers begins to walk away,

12   but then quickly turns around and takes a few steps towards Mr. Dorfner and hits Mr. Dorfner in

13   the face.  Mr. Ayers throws another blow, which Mr. Dorfner manages to block.  Mr. Ayers can

14   be seen throwing more blows before two other staff members intercede and take Mr. Ayers to the

15   floor.  Mr. Dorfner assists the two other staff in gaining control of plaintiff on the floor until one

16   of the other staff members places him in restraints.  Because of the angle of the camera and

17   placement of the staff over Mr. Ayers, it is not possible to completely discern what the staff and

18   Mr. Ayers are doing while Mr. Ayers is restrained on the floor.  Three other staff then arrive and

19   Mr. Dorfner steps away while the remaining staff lift Mr. Ayers to his feet and remove him from

20   the area.  *Id.*  A second surveillance video taken from the opposite end of the hall shows Mr.

21   Ayers throwing additional punches while Mr. Dorfner holds his arms up to deflect them.  Dkt.

22   57, Attach. B at 01:19.

REPORT AND RECOMMENDATION - 11

It is clear from the surveillance video that Mr. Dorfner did not perform "several knee drops" to Plaintiff's left temple and that Plaintiff was not laying compliantly on the floor following the initial takedown.  Even assuming the facts as presented by Mr. Ayers as to what was said by the parties is true,  Mr. Ayers has provided no competent evidence, beyond his conclusory assertions, that Mr. Dorfner's actions were excessive.  Notably, Mr. Ayers does not dispute that he first assaulted Defendant Dorfner but rather, rationalizes that he had reason to do so and that he has shown an exceptional amount of patience in not having "smacked this mentally-abusive youngster before the evening of Feb. 17/06."  See e.g., Dkt. 66-10, p. 28.

The surveillance video also does not comport with Mr. Ayers's description of Defendant Hogan's conduct.  The video reflects that Mr. Ayers was swinging at Defendant Dorfner when Mr. Hogan intervened.  Dkt. 52-2, Attach. B at 01:20-01:25.   In another version of the events, Mr. Ayers states that after he "tapped" Defendant Dorfner on the chin, Mr. Hogan struck him in the ribcage.  Dkt. 66-4, p. 1.  The court notes that in his witness statement dated January 17, 2006, Defendant Hogan stated that he ran towards Mr. Ayers and took him to the ground after he saw Mr. Ayers throwing punches at Defendant Dorfner. Dkt. 66-5, p. 22.   However, this statement is not included in his declaration.  In his declaration, Mr. Hogan merely states his conclusion that he only used the amount of force that was necessary.

However, Mr. Ayers's allegations that Mr. Dorfner "continuously assaulted" him while he lay compliantly on the floor and that Defendant Hogan "blindsided" him with a blow to the ribs, are not supported by the surveillance video of the incident.  In light of the fact that Mr. Ayers was actively resisting attempts by staff to restrain him after he assaulted Mr. Dorfner and continued in his attempts to assault Mr. Dorfner further, it cannot be said that the force used to stop Mr. Ayers and to restrain him was excessive.

REPORT AND RECOMMENDATION - 12

As noted above, the relevant inquiry here is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." However, not "every malevolent touch by a prison guard gives rise to a federal cause of action," and it is proper to evaluate the need for application of the force, the amount of force used, the threat reasonably perceived by the responsible officials and efforts taken to temper the severity of a forceful response. *Hudson*, 503 U.S. at 7.   The absence of serious injury is also relevant to the court's evaluation.  The undisputed evidence reflects that Mr. Ayers refused medical evaluation and/or treatment on the day of the incident and reported soreness in his ribcage two days later for which Tylenol was prescribed.

Viewing the evidence in the light most favorable to Mr. Ayers, the undersigned concludes that there exists "no genuine issue as to any material fact" relating to Mr. Ayers' claims that Defendants Dorfner and Hogan used excessive force against him.  Accordingly, the undersigned recommends that Defendants' motion for summary judgment on claims against Defendants Dorfner and Hogan for excessive force be **GRANTED** and that claims against Defendants Dorfner and Hogan for excessive force on January 17, 2006 be **dismissed with prejudice**.

**B.    THE JUNE 1, 2008 INCIDENT- JOSE GARCIA**

Mr. Ayers alleges that Defendant Jose Garcia falsely reported that Mr. Ayers assaulted him in mid-2008.  Dkt. 15, at 5, ¶ 2.[5]   As a result, Mr. Ayers was placed in administrative segregation for 41 days for the assault.  *Id.*  Mr. Ayers alleges that his placement in administrative segregation was done without "any type of hearing."  *Id.*  The court's review of

---

[5] Although Mr. Ayers refers to August 8, 2008, the evidence reflects that the incident occurred on June 1, 2008. Dkt. 52, ¶9, Attach. D.

REPORT AND RECOMMENDATION - 13

Mr. Ayers' claim that he was placed in administrative segregation without adequate procedural safeguards follows in a separate section below.

(1)     Facts and Evidence Presented – False Assault Report

Defendant Jose Garcia is a SCC staff member whose duties include interacting with SCC residents on a regular basis, assisting residents in maintaining pro-social behavior, providing redirection to residents displaying behavioral dyscontrol, documenting contacts with residents, and assisting residents to move to less stimulating environments within the facility when overstimulation threatens the safety and security of the facility, staff, other residents, or residents experiencing behavioral dyscontrol.  Dkt. 52, ¶ 2.

Defendants provide a surveillance video tape of the June 1, 2008 incident.  Dkt. 52, Attach. E.  In her declaration, Becky Denny identifies the staff member first seen on the video on the left side of the screen at 00:01, in a green shirt, with dark hair and dark glasses, as Jose Garcia and Mr. Ayers as the black man wearing a blue cap and facing the door.  Dkt. 52, p. 3.

In his declaration, Defendant Garcia states that the incident report he wrote regarding the June 1, 2008 incident is true and correct to the best of his recollection at the time he wrote his report.  Dkt. 56, p. 2.   According to the incident report, Mr. Garcia received a call from Recreation Staff Mike Hogan informing him that Mr. Ayers had just poured a cup of coffee on a rock outside the recreation building where residents sometimes sit and smoke.  Mr. Garcia saw that the rock was wet and he spoke to Mr. Ayers regarding the incident.  Mr. Ayers responded by becoming argumentative and accused Mr. Garcia of harassment.  Mr. Ayers was loud and cursing at Mr. Garcia.  Because Mr. Ayers was drawing the attention of others, Mr. Garcia directed Mr. Ayers to return to his unit.  Mr. Garcia and two others then escorted Mr. Ayers back to his unit.  Dkt. 52, Attach. D., pp. 1-2.

REPORT AND RECOMMENDATION - 14

Once in the sally port I directed Res. Ayers to stand by the wall. He did so and continued to yell profanities and threats to me. I then opened the Inner sally port door, A206, to tell RRC Graves not to let any other residents off of their tiers. I was unable to do so as Res. Ayers ran towards me an stuck his left arm though the small opening of the door, facing away from me, and bumping his shoulder into my chest. At this time it was 1852 hrs and I directed Res. Ayers to back away from the door and not to touch me again. At this time I heard Central Control announce the Incident as an emergency over the radio. Res. Ayers did not move. I then told him not to push me because it is staff assault. Res. Ayers said, "That's not assault!" and then pulled his left arm out of the door, stepped on my right foot, and elbowed me in the chest with his left arm. At this time I was knocked off balance and began to fall. My glasses began to fall off of the bridge of my nose as I was going down. At this time Res. Ayers turned and punched me with his right fist on the left side of my mouth, smashing my glasses into my face and breaking them. I landed on my back.

Dkt. 52, Attach. D., pp. 1-2; and Attach. E (Surveillance Video) at 02:24–02:29.

### (2)   Constitutional Analysis

An "inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir.1986). An inmate who has been falsely accused can state a constitutional claim if the filing of the false report was done in retaliation for the exercise of his constitutional rights, see *Hines v. Gomez*, 108 F.3d 265, 267 (9th Cir.1997), or the inmate is not afforded the procedural due process safeguards required by *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Mr. Ayers makes no assertion (and provides no evidence) that Defendant Garcia's report of the June 1, 2008 incident was done in retaliation for Mr. Ayers's exercise of any constitutional right or that he was denied procedural due process. Instead, Mr. Ayers argues that witnesses to the incident will state that he did not commit the assault. He mentions Resident Advocate Donna Waters and RRC Annette Rivers. Dkt. 66, p. 2. He has produced no statement by Ms. Waters

REPORT AND RECOMMENDATION - 15

1   and a statement dated August 3, 2008 containing the typewritten name of Annette Rivers is

2   unsigned.  Dkt. 66-7, pp. 4-5; Dkt. 66-8, pp. 1-2.

3           On the other hand, the surveillance video reflects Plaintiff being escorted by three SCC

4   employees.  Defendant Garcia is standing at the sally port door of the living unit.  He says

5   something to Mr. Ayers.  Dkt. 52, Attach. E at 00:04-00:16.  Mr. Ayers walks off and Defendant

6   Garcia is seen standing at the door for about two minutes.  A person can be seen walking around

7   on the other side of the door.  Mr. Garcia begins to open the door and it appears that he begins to

8   speak to the person on the other side of the door.  *Id.* at 02:11.  Mr. Ayers walks up to the door

9   and places his arm in the partially opened door.  *Id.*  Mr. Ayers then pulls his arm out of the door,

10  puts it back in again and pushes through the door.  *Id.* 2:25.  Defendant Garcia falls back on to

11  the floor and Mr. Ayers falls on to the ground after him.  *Id.* 2:32.  Four SCC employees,

12  including Defendant Garcia are seen taking Mr. Ayers to the floor.  Defendant Garcia is seen on

13  the tape without his glasses.  *Id.* 3.07.  One staff member is seen with his knee on Mr. Ayers's

14  back.  Mr. Ayers does not appear to be moving.  After less than two minutes, another SCC

15  employee walks over, Defendant Garcia backs up, and Mr. Ayers is helped to his feet by the

16  remaining three employees.  *Id.* 5:19.  Mr. Ayers walks through the sally port door without

17  assistance.  *Id.*

18          The report of Defendant Garcia comports with the images on the security video.  In

19  addition, the evidence reflects that Mr. Ayers was checked-out by SCC medical following the

20  incident before he was escorted to IMU.  Dkt. 66-7, p. 20.  Yet, there is no evidence that Mr.

21  Ayers was injured.

22          In light of the security video and supporting statements rendered at the time of the June 1,

23  2008 incident, Mr. Ayers's unsupported version of the facts cannot legitimately create a genuine

REPORT AND RECOMMENDATION - 16

issue of material fact as to Mr. Ayers's claim that he did not assault Defendant Garcia.  In addition, there is no evidence that Defendant Garcia retaliated against Mr. Ayers for the exercise of his constitutional rights or that Mr. Ayers was not afforded procedural safeguards.

Accordingly, the undersigned recommends that Defendants' motion for summary judgment on claims against Defendant Garcia for filing a false assault charge be **GRANTED and dismissed with prejudice.**

**(C)   PLACEMENT IN IMU FOLLOWING JUNE 1, 2008 INCIDENT**

**(1)   Facts and Evidence Presented - Administrative Segregation**

Mr. Ayers alleges that after the June 1, 2008 incident, he was placed in administrative segregation without any type of hearing for 41 days.  Dkt. 15, p. 5.  It is unclear, from Mr. Ayers First Amended Complaint (Dkt. 15), who he asserts is responsible for placing him in administrative segregation for 41 days without a hearing.  To the extent he makes this claim against Mr. Garcia, his claim fails as there is undisputed evidence that Mr. Garcia is not responsible for Mr. Ayers' placement in administrative segregation as he is not authorized to make such a decision.

Dr. Sziebert states that RRC staff, including Jeremy Dorfner, Mike Hogan, Jose Garcia and Richard Steinbach, are not responsible to decide whether to place a resident in administrative segregation, in the intensive management unit or under intensive management conditions, or to determine when and whether an administrative hearing will occur.  Dkt. 51, p.3; Dkt. 56, p.2.

Therefore, to the extent this claim is made against Jose Garcia, Mike Hogan, Richard Steinbach or Jeremy Dorfner the undersigned recommends that the defendant's motion be **GRANTED** and the claim be **dismissed with prejudice as to Defendants Garcia, Hogan, Steinback and Dorfner.**

REPORT AND RECOMMENDATION - 17

D.      **THE AUGUST 8, 2008 CUFF-PORT INCIDENT, DEFENDANT STEINBACH**

(1)      **Facts and Evidence Presented**

Mr. Ayers alleges that he sustained "two 1-inch contusions" when Defendant Steinbach closed the cuff-port door on his arm.  Mr. Ayers describes the cuff-port door as a sharp, jagged slot.  Dkt. 15, p. 6.  Mr. Ayers alleges that the discomfort caused by Defendant Steinbach slamming the cuff-port door on his arm lasted for fourteen days and that he is physically scarred for life.  *Id.*  In his affidavit, Mr. Ayers describes the incident as follows:

> RRC Steinbach orchestrated an harassment situation while I was in the (IMU) for the false Garcia assault incident by repeatedly badgeringly [sic] asking me whether I wanted my lunch.  Even though following each time I was asked this question by Steinbach, I responded in my usual affirmative manner by asking him to "just open the cuffport and put my food in."  He then intentionally and very annoyingly, and consciously so, walked away from my (IMU) door as though I hadn't affirmatively responded to his question.  Steinbach did this to create the impression as though I had refused my lunch, and that the lunch meal would be thrown in the trash.  Even though he was totally aware that his repeated acts were causing me great emotional anguish, he continued to verbally irritate this plaintiff to the point where upon finally receiving the said meal I threw a fresh cup of orange drink on him through the cuff port.  Immediately following this, as I attempted to pull my right arm back into my (IMU) cell, he quickly reached, grabbing the heavy, jagged edged cuffport door, and maliciously slammed my forearm in the cuffport and pinned my arm there, forcing me to painfully cut myself as I worked my arm back.  My right forearm ached and throbbed to the bone for one week following this engeneered [sic] assault.  (RRC) Riley was present and witnessed this turn of events.  She also had been shown my injuries sustained from this because I called and asked her to look at the cuts that I received from this assault.

Dkt. 15, p. 5.

According to Dr. Leslie Sziebert, SCC's staff psychiatrist, certain protocols were in place when meals were delivered to Mr. Ayers on his living unit.  Dkt. 51, p. 2.  SCC residents normally receive their meals in the SCC dining room at scheduled times each day.  *Id.*  When a resident had a medical or behavioral problem that prevents him from traveling to the dining

REPORT AND RECOMMENDATION - 18

room, with staff approval, the resident may receive his meal on his living unit.  Meals on unit are limited to necessity because the SCC has had on-going issues with residents using food products from meals to brew alcohol (called 'pruno").  Pruno presents a significant security hazard to staff and residents, particularly when a resident under the influence of pruno acts out.  *Id.*  Mr. Ayers has a history of hoarding food in his bedroom.  Thus, when he receives meals on unit, residential staff are instructed to require Mr. Ayers to dispose of the remains of his earlier meal before staff will deliver to him his next meal thereby avoiding allowing Mr. Ayers to possess the ingredients to manufacture pruno.  *Id.*, pp. 2-3.

Defendant Steinbach is a residential rehabilitation counselor.  Dkt. 53, p. 1.  In his declaration, Defendant Steinbach states that it has never been his motivation or intention to intentionally harass Mr. Ayers or to provoke or deliberately infuriate Mr. Ayers into behavior with the intent to engage in a physical confrontation or to provide an excuse to create negative behavioral or incident reports about him.  Dtk. 53, p. 2.

Mr. Ayers received a Category 1 BMR for physical aggression.  Mr. Ayers declined to attend an administrative hearing on the matter held on September 2, 2008.  Dkt. 52, ¶ 13; Dkt. 52-2, Attach. H, pp. 6-7.

Defendants rely on the Declaration of Defendant Steinbach (Dkt. 53), who does not address the incident in his declaration, and on the Declaration of Becky Denny (Dkt. 52), to which are attached copies of SCC's documentation regarding the cuff-port incident, including the results of an administrative review hearing held on September 2, 2008.  Dkt. 52 (citing Dkt. 52-2, Attach. H, pp. 12-13).  As noted above, however, Ms. Denny cannot testify to what occurred at the administrative review hearing.  The court can take notice only of the fact that an investigation was completed and that the panel members concluded that Mr. Ayers' action fit the

REPORT AND RECOMMENDATION - 19

definition of "Agression; Physical", a Category 1 violation, and found Mr. Ayers in violation of SCC Policy 235: Behavioral Intervention and Treatment. *Id.*, p. 12.

Thus, the only issue before the court is whether, taking the facts as asserted by Mr. Ayers, did Mr. Steinbach use excessive force in attempting to close the cuff-port door.

### (2)   Constitutional Analysis

The law relating to excessive force claims under the Eighth Amendment is set forth fully above and will not be repeated here except to reiterate that in determining such a claim, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 7.

Based on the extremely limited evidence presented by Defendants, the court is unable to make a determination as to whether the force was applied in a good-faith effort to maintain or restore discipline or whether it was maliciously and sadistically applied to cause harm.  There is no competent evidence before the court relating to Defendant Steinbach's need to apply force, the amount of force used, or whether plaintiff was posing a threat.  The court notes that in the administrative review report, there is an indication that Mr. Ayers had his arm hanging out of the cuff-port, was moving it in an erratic manner and seemed to reach out and "possibly grab RRC Steinbach."  Dkt. 52, Attach. H, p. 1.  However, this document was merely appended to Ms. Denny's Declaration and is not supported by competent testimony.  Defendant Steinbach provides no details regarding the incident in his declaration and there is nothing in the record from which the court may infer that Mr. Ayers was posing some sort of threat to Defendant Steinbach.

Thus, the court must assume the facts relating to the incident as they are stated by Mr. Ayers in his complaint and affidavit.  Based on these facts, Defendants have failed to meet their

REPORT AND RECOMMENDATION - 20

burden of establishing the absence of a genuine issue of material fact relating to Mr. Ayers's claim that Defendant Steinbach intentionally slammed the cuff-port door on Mr. Ayers's arm after Mr. Ayers threw the orange drink on Defendant Steinbach.  Thus, the undersigned recommends that Defendants' motion for summary judgment on this claim be **DENIED.**

E.    **JULY 30, 2008 – REMOVAL OF BLANKETS BY DEFENDANT STEINBACH**

       **(1)    Facts and Evidence Presented**

Mr. Ayers alleges that while he was in administrative segregation following the June 1, 2008 incident, he was regularly verbally harassed and had blankets that kept him warm taken away from him "as a means of torment" by Richard Steinbach.  Dkt. 15, p. 6.

On July 30, 2008, while Mr. Ayers was in administrative segregation, he submitted a grievance complaining that RRC Steinbach "for the second time caused me to become extremely upset, and verbally disruptive by taking away my third blanket while in IMU causing me to be cold throughout the night.  Supv. was notified."  Dkt. 66-8, p. 40.  The grievance investigator, R. Alex, met with Mr. Ayers on August 4, 2008 and with RRC Steinbach on August 20, 2008.  Dkt. 66, Ayers p. 362.  Mr. Ayers was advised that RRC Steinbach was instructed to remove any excess items from Mr. Ayers's room while Mr. Ayers was in the IMU and RRC Steinbach felt that a third blanket was excessive.  *Id.*

According to Defendant Sziebert, when a resident is in administrative segregation, staff conduct a bedroom sweep each time the resident leaves the room (such as for a shower or outdoor recreation), to ensure that the resident possess only the property permitted pursuant to the resident's treatment plan.  Dkt. 51, ¶ 9.  The objective of the sweeps is to ensure the resident does not possess items that could present a risk of harm to residents or staff.  *Id.*  Plaintiff was in administrative segregation during the summer months of 2008.  While Mr. Ayers was in

1   administrative segregation, his bedroom was searched several times.  Unauthorized items were

2   found on several occasions, including two razor blades taped together and secreted under the

3   batteries in the battery compartment of a remote control.  *Id.*  Other items included two pens

4   hidden in a box, and on July 10, 2008, an excess blanket (plaintiff was permitted to retain two

5   blankets rather than three).  *Id.*

6       Defendant Steinbach conducted a number of these bedroom sweeps, including the sweep

7   on July 10, 2008.  Mr. Steinbach states in his declaration that he conducted the sweep at his

8   supervisor's direction, and not for the purpose of causing plaintiff to become upset or retaliating

9   against Mr. Ayers.  Dkt. 53, ¶ 3.

10

11          **(2)     Constitutional Analysis**

12      It is unclear what constitutional violation is being asserted by Mr. Ayers with regard to

13  this claim.  He claims that Defendant Steinbach verbally harassed him and took blankets away

14  from him as a "means of torment."  Dkt. 15, p. 6.  Mr. Ayers' complaints of verbal harassment

15  by Defendant Steinbach and others are discussed separately below.  The court analyzes his claim

16  of removal of the blankets as an Eighth Amendment conditions of confinement claim.

17

18      "[A] prison official cannot be found liable under the Eighth Amendment for denying an

19  inmate humane conditions of confinement unless the official knows of and disregards an

20  excessive risk to inmate health or safety."  *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct.

21  1970, 128 L.Ed.2d 811 (1994).  A plaintiff who claims that the conditions of his confinement fall

22  below the constitutional standard must make two showings. "First, the plaintiff must make an

23  'objective' showing that the deprivation was 'sufficiently serious' to form the basis for an Eighth

24  Amendment violation."  *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir.2000) (citation omitted).

25  "The Constitution ... 'does not mandate comfortable prisons, and only those deprivations denying

26

REPORT AND RECOMMENDATION - 22

'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (citations omitted).  Second, the prisoner must make a "subjective" showing that prison officials "acted with the requisite culpable intent such that the infliction of pain is 'unnecessary and wanton.'  In prison conditions cases, prison officials act with the requisite culpable intent when they act with deliberate indifference to the inmate's suffering." *Anderson v. County of Kern*, 45 F.3d 1310, 1312 (9th Cir.1995).

To make the required objective showing that the conditions of his confinement were "sufficiently serious" to support an Eighth Amendment claim, plaintiff needs to present evidence of an "excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.  The risk must be shown in a specific deprivation of a basic human necessity. "Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson*, 501 U.S. at 304-05.  "[E]xtreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

Deprivations that by themselves might not support a claim can, in a narrow category of cases, combine to create a constitutional violation under the Eighth Amendment when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise-for example, a low cell temperature at night combined with a failure to issue blankets. *Wilson*, 501 U.S. at 304-05.

Mr. Ayers alleges that he had "blankets that kept [him] warm taken away from [him] as a means of torement [sic]." Dkt. 15, p. 6.  Removal of one of three blankets from Mr. Ayer's room

1   during the summer months is not a deprivation that is 'sufficiently serious' to form the basis for

2   an Eighth Amendment violation.  There is also no evidence that Mr. Ayers has suffered harm

3   from the removal of one of his blankets.

4          As Mr. Ayers has offered no evidence to support his assertion that removal of a third

5   blanket from his room violated his constitutional rights, he has shown no constitutional violation.

6   Accordingly, the undersigned recommends that Mr. Ayers's claim against Defendant Steinbach

7   relating to removal of the blanket should be **GRANTED and dismissed with prejudice.**

8

9   **F.      VERBAL HARASSMENT AND DELIBERATE PROVOCATION –
           DEFENDANTS DORFNER, HOGAN, GARCIA AND STEINBACH**

10

11          **(1)      Facts and Evidence Presented**

12          Mr. Ayers alleges generally that the defendants have been allowed to harass, infuriate and

13   provoke him, thus "orchestrating" situations where they are then free to assault him, write

14   behavior reports against him and place him in isolation.  Dkt. 15, pp. 6-8.  For example, he

15   alleges that Defendant Steinbach "continuously instigated and deliberately infuriated [him] in the

16   presence of a female staff member named Ms. Riley, in order to orchestrate conditions that

17   allowed [Defendant Steinbach] to painfully assault [him]" (Dkt. 15, p. 6, ¶ 7) and that

18   Defendants Hogan and Dornfer directed Defendant Garcia to unnecessarily investigate and

19   repetitively harass him.  Dkt. 15, p. 7.  Mr. Ayers claims that Defendant Garcia "unnecessarily

20   instigate[d] and repetitively harass[ed]" Mr. Ayers.  *Id.*, at 6, ¶ 8.  With regard to Defendant

21   Dorfner, Mr. Ayers alleges that Mr. Dorfner has been allowed to harass him for years, that

22   Defendant Dorfner deliberately set out to infuriate him or that Defendant Dorfner deliberately

23   provoked Mr. Ayers into hitting him so that he could make a claim under L&I for benefits.  Dkt.

24   66-2, p. 25.

25

26

REPORT AND RECOMMENDATION - 24

In their declarations, the defendants state that they never intended to intentionally harass Mr. Ayers to provoke or deliberately infuriate him into behavior with the intent to engage in a physical confrontation or to provide an excuse to create negative behavioral or incident reports about him. Dkt. 53, p. 2; Dkt. 54, p. 2; Dkt. 55, p. 2. Dkt. 56, p. 2. Defendant Steinbach further states that he never tried to torment Mr. Ayers or orchestrate conditions or situations to cause Mr. Ayers to act out. Dkt. 53, p. 2.

**(2)    Constitutional Analysis**

Allegations of verbal harassment and abuse fail to state a claim cognizable under 42 U.S.C. § 1983. See *Freeman v. Arpaio*, 125 F.3d 732, 738 (9th Cir.1997); *Rutledge v. Arizona Bd. of Regents*, 660 F.2d 1345, 1353 (9th Cir.1981), aff'd sub nom. *Kush v. Rutledge*, 460 U.S. 719 (1983); see, e.g., *Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir.1996), amended 135 F.3d 1318 (9th Cir.1998) (disrespectful and assaultive comments by prison guard not enough to implicate 8th Amendment); *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir.1987) (directing vulgar language at prisoner does not state constitutional claim); *Burton v. Livingston*, 791 F.2d 97, 99 (8th Cir.1986) ("mere words, without more, do not invade a federally protected right"); *Ellingburg v. Lucas*, 518 F.2d 1196, 1197 (8th Cir.1975) (prisoner does not have cause of action under § 1983 for being called obscene name by prison employee); *Batton v. North Carolina*, 501 F.Supp. 1173, 1180 (E.D.N.C.1980) (mere verbal abuse by prison officials does not state claim under § 1983). This is so even if the verbal harassment is racially motivated. See *Hoptowit v. Ray*, 682 F.2d 1237, 1252 (9th Cir.1982) (federal court cannot order guards to refrain from using racial slurs to harass prisoners).

The court notes that Mr. Ayers has provided no evidence to support his allegations that any of the defendants, including Defendants Dorfner, Hogan, Garcia and Steinbach,

REPORT AND RECOMMENDATION - 25

"deliberately infuriated" him to "orchestrate conditions" with the intent to cause Mr. Ayers to act out, thus giving the defendants an excuse to assault Mr. Ayers and to write negative reports about him.  See e.g., Dkt. 15 at 6, ¶¶ 6, 7, 8.  Mr. Ayers declares that he has filed numerous abuse complaints and grievances over the years against the defendants asserting that their interactions with him "always resulted in reactive displays of humiliation, strong mental anguish, and infuriation."  Dkt. 61, 4, ¶¶ 5, 6.  Mr. Ayers has provided the court with no evidence, however, other than his repeated conclusory assertions of malicious intent, to support his allegations that staff members deliberately intend to "orchestrate conditions" to "deliberately infuriate" him.

Defendants have provided expert testimony regarding Mr. Ayers' psychiatric conditions, including Antisocial Personality Disorder with significant psychopathy. Dkt. 51, at ¶ 4. According to Dr. Sziebert, Mr. Ayers engages in chronic loud, aggressive, hostile, racial, and violent communications and behaviors.  *Id.*, at ¶ 5.  His treatment team has had to address Mr. Ayers' behaviors through behavioral management because he refuses to engage in any therapeutic process that could assist him to manage his volatile mood and emotional dysregulation. *Id*.

Even assuming that Mr. Ayers's allegations of verbal abuse and harassment are true, as noted above, allegations of verbal harassment and abuse fail to state a claim cognizable under 42 U.S.C. § 1983.  Accordingly, the undersigned recommends that Defendants motion for summary judgment be **GRANTED** on claims that they "deliberately infuriated" him to "orchestrate conditions" with the intent to cause Mr. Ayers to act out and that those claims be **dismissed with prejudice.**

G.    **CLAIMS AGAINST DEFENDANTS THOMAS BELL, D.O., BECKY DENNY, HENRY RICHARDS, PH.D., AND LESLIE SZIEBERT, M.D.**

REPORT AND RECOMMENDATION - 26

Defendants Bell, Denny, Richards and Sziebert argue that Plaintiff's claims against them in this action must be dismissed because they are duplicative of claims against them in *Ayers v. Richards, et al.*, C08-5390 BHS/KLS.  Dkt. 50, p. 9.   Defendants state that there, as in this case, Mr. Ayers asserts violations of Washington's Public Records Act against Ms. Denny; allegations of lack of medical care (broken thumb) against Dr. Bell; allegations regarding punitive conditions in SCC's IMU against Dr. Sziebert, and allegations regarding Dr. Richards in his role as SCC's superintendent for failure to intervene in Mr. Ayer's assertions of mistreatment.  *Id.*, pp. 9-10.

Defendants moved for summary judgment dismissal of Mr. Ayers's claims in Case C08-5390 on October 30, 2009.  *Id.*  However, Defendants first moved for the imposition of financial sanctions against Mr. Ayers for litigation abuses.  Dkt. 167.  Defendants requested a stay of the case until such sanctions were paid.  Dkt. 167, p. 2.  Alternatively, Defendants requested that the court dismiss the case with prejudice based on the court's previous admonishments to Mr. Ayers. *Id.*  The court granted the first request by imposing financial sanctions against Mr. Ayers, staying the case until the financial sanctions were paid and when Mr. Ayers failed to pay the sanctions, dismissing the case without prejudice.  Dkts. 183, 187.  Defendants moved for reconsideration of the court's order dismissing the case *without* prejudice.  Dkt. 189 in Case No. C08-5390 BHS/KLS.  On April 23, 2010, Judge Settle granted the motion for reconsideration and re-referred the case to the undersigned for consideration of the Defendants' motion for summary judgment.  Dkt. 201 in Case No. C08-5390 BHS/KLS.

The undersigned cannot recommend granting Defendants' motion on these claims on the grounds that they are duplicative because the previous lawsuit has not been adjudicated on the merits. See, e.g., *Costantini v. Trans World Airlines*, 681 F.2d 1199, 1201-02 (9th Cir.1982).  It

REPORT AND RECOMMENDATION - 27

is also not clear based on the information provided by Defendants on their motion for summary judgment whether the facts from this lawsuit arise or substantially arose from the same transactional nucleus of facts.  Accordingly, the undersigned recommends that Defendants' motion for summary judgment on these claims be **DENIED without prejudice.**  Defendants are free to raise the motion again dependent on the final determinations made in *Ayers v. Richards, et al.*, C08-5390 BHS/KLS.[6]

## H.   ELEVENTH AMENDMENT – DAMAGE CLAIMS AGAINST DEFENDANTS IN THEIR OFFICIAL CAPACITIES

In his Amended Complaint, Mr. Ayers asserts allegations against "all listed defendants acting in their official capacity" and seeks monetary damages.  *See e.g.*, Dkt. 15-2, pp. 11, 17.

Absent a waiver of sovereign immunity, neither states nor state officials in their official capacities are subject to suit in federal court under 42 U.S.C. § 1983.  *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989).  Mr. Ayers alleges in his Amended Complaint that he is suing Defendants in their official capacities.  A suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  *Brandon v. Holt,* 469 U.S. 464, 471, 105 S. Ct. 873, 877, 83 L. Ed. 2d 878 (1985).  As such, it is no different from a suit against the State itself.  *See Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S. Ct. 3099, 3104-05, 87 L. Ed. 2d 114 (1985); *Monell v. Dep't of Social Servs. of City of New York,* 436 U.S. 658, 690, n.55, 98 S. Ct. 2018, 2035, n.55, 56 L. Ed. 2d 611 (1978).   By naming the defendants in their official capacities, Mr. Ayers is bringing suit against the state.

---

[6] The undersigned does find, however, that summary judgment dismissal is warranted on Mr. Ayers's claim of violations of Washington's Public Records Act.  This issue is discussed more fully below.

REPORT AND RECOMMENDATION - 28

1    Accordingly, the undersigned recommends that Defendants motion for summary

2    judgment for damages brought against them in their official capacities be **GRANTED** and

3    recommends that claim be **dismissed with prejudice.**

4    **I.    PUBLIC DISCLOSURE ACT CLAIMS**

5        Mr. Ayers alleges that unnamed defendants have denied him his right to "public

6    disclosure" documents, including the video and reports relating to his claim of excessive force.

7    Dkt. 16, pp. 7-8.  Defendants assert that Mr. Ayers is essentially alleging that unnamed

8    defendants have violated Washington State's Public Disclosure Act, Wash. Rev. Code 42.56,

9    which permits persons who have been denied an opportunity to view or copy a public record to

10   bring an action in state court against an "agency" to show cause why it failed to comply with a

11   proper public records request.  Dkt. 50, p. 19 (citing Wash. Rev. Code 42.56.550(1).

12       For example, Mr. Ayers submitted letters from DSHS declining his request for a copy of

13   the video taken on January 17, 2006, in which DSHS takes the position that SCC is exempt from

14   disclosing the information per RCW 42.17.310(ddd).  See, e.g., Dkt. 66-5, pp, 36, 45.  Another

15   letter dated June 4, 2008 from DSHS concerning Mr. Ayers's request for investigative

16   documents relating to the June 1, 2008 incident, informs Mr. Ayers that the documents are not

17   disclosable until the investigation is concluded.  Dkt. 66-7, p. 49.  On the top of this letter, Mr.

18   Ayers has written "6/1/08 verification of subversive non-disclosure."  *Id.*

19       If Mr. Ayers is claiming that he has made a public disclosure request and that an agency

20   has failed to provide him with an opportunity to view or copy a public record, he must bring

21   action to pursue that claim against the agency withholding the information in state court pursuant

22   to Wash. Rev. Code 42.56.550(1).  In such a situation, the state agency is the proper defendant

23   under the Act, not individual state actors.

REPORT AND RECOMMENDATION - 29

The undersigned recommends that Defendants' motion for summary judgment on this issue be **GRANTED** and that all claims for withholding public disclosure documents should be **dismissed with prejudice.**

### J.      WASHINGTON'S ABUSE OF A VULNERABLE ADULT ACT, RCW 74.34

Defendants state that Mr. Ayers mentions Washington's Abuse of Vulnerable Adults Act, Wash. Rev. Code chapter 74.34 (the "Act") as a legal basis for at least one of his claims and they argue that Mr. Ayers does not have standing to raise a claim under the Act.  Dkt. 50, p. 19 (citing Dkt. 15 at 7, ¶ 15).

The purpose of the Act is to protect certain persons whose physical or mental disabilities have placed them in a dependent position. Wash. Rev. Code 74.34.005; *Calhoun v. State*, 146 Wash. App. 877, 889, 193 P.3d 188 (2008).  The Act defines a "vulnerable adult" as an adult who either:  (a) is at least sixty years old; (b) is found incapacitated under chapter 11.88 Wash. Rev. Code; (c) has a developmental disability as defined under Wash. Rev. Code 71A.10.020; (d) is admitted to any "facility," as that term is defined in the Act; or (e) is receiving services from home health, hospice, or home care agencies licensed or required to be licensed under chapter 70.127 Wash. Rev. Code; or (f) is receiving services from an individual provider.  Wash. Rev. Code 74.34.020(15)

Mr. Ayers does not refer to the Act at page 7, ¶ 15 of the amended complaint.  In that paragraph, Mr. Ayers alleges that Defendants Weinberg and Sziebert failed to separate him from severely mentally ill residents, causing him to live in fear, suffer on-going emotional distress and repetitive assaults from the residents over a four year period.  Dkt. 15, p. 7, ¶ 15. [7]   Later in his

---

[7] When a plaintiff has been assaulted by other residents, the appropriate analysis to determine liability is whether the defendants acted with deliberate indifference with regard to threats to his safety.  *Redman v. County of San Diego*, 942 F.2d 1435, 1443 (9th Cir. 1991).  That issue is not before the Court in this summary judgment motion.

REPORT AND RECOMMENDATION - 30

1   amended complaint, however, Mr. Ayers asserts that the "superintendent's failure to separate the

2   reported abusive staff member from the victimized petitioner" is evidence of the superintendent's

3   failure to enforce SCC policy.  Dkt. 15-2, p. 35.  Plaintiff then refers to several cases, an SCC

4   abuse policy, and RCW 74.34 for the proposition that "any unwarranted action or inaction that

5   causes the detainee to act in a disturbed manner."  *Id.*    In his "Brief of Declaratory Evidence,"

6   Mr. Ayers also asserts that he is a "vulnerable adult subject to the influence of harassment" and

7   that Defendant Dorfner was aware of this and exploited his vulnerability.  Dkt. 66-2, p. 35; see

8   also, Dkt. 66-3, p. 18.

9

10          It is not entirely clear whether Plaintiff intended that the Act be viewed as support for his

11   claims.  However, Defendants are correct that the Act has no applicability to Plaintiff's claims.

12   As noted by Defendants, Plaintiff is not a vulnerable adult entitled to a cause of action under the

13   Act because he is not at least 60 years old (Dkt. 50, Exh. 1 at 63, l. 3), and because there is no

14   evidence that:  (1) a court has found Mr. Ayers incapacitated as to person or estate, or has

15   appointed a guardian on his behalf (*See* Wash. Rev. Code 11.88.010(1); (2) Mr. Ayers is

16   diagnosed with a developmental disability (*See* Wash. Rev. Code 74.34.005(c); Mr. Ayers is

17   admitted to a "facility" as defined under the Act. *Calhoun v. State*, 146 Wash. App. 877, 888-89,

18   193 P.3d 188 (2008) (the Special Commitment Center is not a "facility" as defined under the

19   Act); (5) Mr. Ayers is receiving care in his home and is not receiving hospice care; and (6) Mr.

20   Ayers is receiving services from an individual provider (Wash. Rev. Code 74.34.020(8) (defining

21   an individual provider to mean a person who provides services in the home).

22

23

24

25

26

REPORT AND RECOMMENDATION - 31

Accordingly, the undersigned recommends that summary judgment on Mr. Ayers claims based on his allegation he is a vulnerable adult as defined in RCW 74.34 be **GRANTED** and **dismissed with prejudice**.

**K.    QUALIFIED IMMUNITY**

Defendants contend that they are entitled to qualified immunity as to Plaintiff's constitutional claims.  "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'"  *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). The court evaluates a defendant's qualified immunity defense using a two-step inquiry.  *Id.* However, the Supreme Court recently held that this two-step inquiry is no longer an inflexible requirement.  *Pearson v. Callahan*, ---U.S. ---, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009) (explaining "that, while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory").  It is within our "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.*

Under *Saucier's* first prong, the court must determine whether, viewing the facts in the light most favorable to the plaintiff, the government employees violated the plaintiff's constitutional rights.  *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.  If the court determines that a constitutional violation has occurred, under *Saucier's* second prong, it must determine whether the rights were clearly established at the time of the violation.  *Id.*  For a right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates the right."  *Id.* at 202, 121 S.Ct. 2151 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).  The protection afforded

REPORT AND RECOMMENDATION - 32

by qualified immunity "safeguards 'all but the plainly incompetent or those who knowingly violate the law.'"  *Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.*, 149 F.3d 971, 977 (9th Cir.1998) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

The court has concluded that Defendants did not violate Mr. Ayers's constitutional rights except as to his claim against Defendant Steinbach.  There, the court noted that Defendants did not meet their burden to show the absence of a genuine issue of material fact.  Thus, it is not necessary to address Defendants' qualified immunity arguments except as to that claim.

Defendants argue that the court should view Mr. Ayers's allegations while keeping in mind the risk to staff from Mr. Ayers's assault on Defendant Steinbach, the threat Mr. Ayers posed to Mr. Steinbach's safety and the fact that Mr. Ayers was actively resisting Mr. Steinbach's attempt to close the cuff port to "neutralize the risk posed by plaintiff attempting to grab staff."  Dkt. 50, p. 18.

Qualified immunity for Defendant Steinbach is inappropriate at this stage of the proceedings.  Disputed questions of material "historical fact" prevent the granting of qualified immunity now.  Disputes of material historical facts are for a jury even though the court would decide as an issue of law the ultimate question of objective reasonableness in a qualified immunity inquiry, i.e., whether, even if constitutional rights were violated, Defendant Steinbach could have believed that his conduct was lawful.  See, e.g., *Torres v. City of Los Angeles*, 548 F.3d 1197, 1210-11 (9th Cir.2008).  The primary qualified immunity inquiry would be whether it would have been clear to a reasonable prison official with Defendant Steinbach's duties that his conduct "was unlawful in the situation he confronted."  *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (emphasis added).  Here, however, it remains unclear what

REPORT AND RECOMMENDATION - 33

1   "the situation he confronted" was when Defendant Steinbach closed the cuff-port door.

2   Defendant Steinbach has provided no evidence to controvert Mr. Ayers's rendition of the facts.

3   Therefore, the court cannot decide the "objective reasonableness" of Defendant Steinbach's

4   actions based on the record before it, and recommends that Defendant Steinbach's motion for

5   summary judgment on qualified immunity be **DENIED.**

6                                         *CONCLUSION*

7           The undersigned recommends that Defendants' motion for summary judgment (Dkt. 50)

8   be **GRANTED, in part, in favor of:**  (1) Defendants Dorfner and Hogan as to allegations of

9   excessive force (January 17, 2006) incident; (2) Defendant Garcia as to allegations of bringing a

10  false charge (June 1, 2008 incident); (3) Defendants Garcia, Hogan, Steinback and Dorfner as to

11  Plaintiff's placement in IMU; (4) Defendant Steinbach as to removal of blankets; (4) Defendants

12  Dorfner, Hogan, Garcia and Steinbach as to allegations of harassment and deliberate

13  provocation; (5) all claims against Defendants for damages in their official capacities; (6) all

14  claims against Defendants under Washington's Public Disclosure and Abuse of Vulnerable

15  Adults Acts.  The foregoing claims against these Defendants should be **Dismissed with**

16  **Prejudice.**

17          The undersigned recommends that Defendants' motion for summary judgment (Dkt. 50)

18  be **DENIED, in part, as to**:  (1) Defendant Steinbach as to allegations of excessive force

19  (August 8, 2008 cuff-port incident) and (2) claims against Defendants Bell, Denny, Richards and

20  Sziebert, which Defendants argue are duplicative of claims asserted in C08-5390 BHS/KLS.[8]

---

[8]If the District Court adopts this report and recommendation, the following claims will remain: (1) against SCC for failure to respond to complaints; (2) against Defendant Steinbach for denial of access to courts by limiting "legal" telephone calls; (3) against Defendant Thomas Bell for lack of medical care after Mr. Ayers broke his thumb on the telephone, (4) against Defendants Weinberg, Sziebert and Stoddard for retaliation for filing of lawsuits and grievances by failing to separate Mr. Ayers from Alder North and Alder West residents; (5) against Defendant

REPORT AND RECOMMENDATION - 34

1

2   Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

3   Procedure, the parties shall have fourteen (14) days from service of this Report to file written

4   objections.  See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those

5   objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985).  Accommodating the

6   time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on

7   **June 2 , 2010**, as noted in the caption.

8   DATED this 10th day of May, 2010.

9

10                                          _s/Karen L. Strombom_____
                                            Karen L. Strombom
11                                          United States Magistrate Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   Steinbach for excessive force on August 8, 2008; and (6) possibly a claim against the remaining defendants
     regarding the Plaintiff's placement in administrative segregation without a hearing.

REPORT AND RECOMMENDATION - 35