1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

LENIER AYERS,

                              Plaintiff,

        v.

HENRI RICHARDS, RICHARD
STIENBACH, MIKE HOGAN,
JERAMY DORFNER, BECKY
DENNY, JOSE GARCIA, LESLIE
SZIEBERT, THOMAS BELL, and
KRYSTAL KNUTSON,

                              Defendants.

No. C08-5541 RJB/KLS

**REPORT AND RECOMMENDATION**
**Noted for:  November 26, 2010**

        Before the court is the second motion for summary judgment of Defendants Thomas Bell,

Becky Denny, Henry Richards, Ph.D, Richard Steinbach and Leslie Sziebert, M.D.

("Defendants" or collectively "SCC")[1].  ECF No. 110.  Defendants argue that Plaintiff's

remaining claims must be dismissed for failure to state a constitutional violation.  Plaintiff Lenier

Ayers has filed no response to the motion.  His failure to do so may be considered by the court as

an admission that the Defendants' motion has merit.  CR 7(b)(2).

        Having carefully reviewed the parties' pleadings, supporting declarations, and balance of

the record, and viewing the evidence in the light most favorable to Mr. Ayers, the undersigned

recommends that the Defendants' second motion for summary judgment be granted.

---

[1] Mr. Ayers also named SCC staff member Carla Jones as a defendant at page 4(C) of his First Amended Complaint.
However, Mr. Ayers has not served Ms. Jones.

REPORT AND RECOMMENDATION - 1

1

2
## SUMMARY OF CASE

3
   In his complaint, Mr. Ayers sets forth multiple claims against multiple parties, including

4
generally claims of excessive force, malicious prosecution, denial of access to courts, denial of

5
medical care, and substandard conditions of confinement.  The court granted Defendants' first

6
motion for summary judgment in part and also granted Defendants' motion to file a successive

7
summary judgment as to Plaintiff's remaining claims. ECF Nos. 89 and 98.

8

9
   The following claims remain:  (A) failure of SCC to respond to complaints; (B) denial of

10
access to courts by limiting "legal" telephone calls by Defendant Sziebert; (C) lack of medical

11
care by Defendant Thomas Bell after Mr. Ayers broke his thumb on the telephone; (D) retaliation

12
by Dr. Sziebert in failing to separate Mr. Ayers from Alder North and Alder West residents; (E)

13
the use of excessive force on August 8, 2008 by Defendant Steinbach; and (F) placement in

14
administrative segregation without a hearing.

15
   The relevant facts, the court's legal analysis and conclusion are set forth under each

16
heading dealing separately with the remaining claims at issue.

17

18
## SUMMARY JUDGMENT STANDARD

19
   Summary judgment will be granted when there is no genuine issue as to any material fact

20
and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The party

21
seeking summary judgment bears the initial burden of informing the court of the basis for its

22
motion, and of identifying those positions of the pleadings and discovery responses that

23
demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

24
317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

25

26

REPORT AND RECOMMENDATION - 2

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Calderone v. United States*, 788 F.2d 254, 259 (6th Cir. 1986).   On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325.  If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S. Ct. 2502, 91 L.Ed.2d 202 (1986).   The party opposing the motion must do more than simply show that there is some metaphysical doubt as to the material facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  "A plaintiff's belief that a defendant acted from an unlawful motive, without evidence supporting that belief, is no more than speculation or unfounded accusation about whether the defendant really did act from an unlawful motive." *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001).

The Ninth Circuit has expressly stated that "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment.  *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987), *cert. denied*, 484 U.S. 1006 (1988).  A plaintiff cannot rest upon the allegations in his complaint, but must establish each element of his claim with "significant probative evidence tending to support the complaint." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1980).  A party opposing a motion must present facts in evidentiary form and cannot rest upon the pleadings.  *Anderson*, 477 U.S. 242.  Genuine issues of material fact are not raised by conclusory or speculative allegations. *Lujan*, 497 U.S. 871. The purpose of

REPORT AND RECOMMENDATION - 3

1  summary judgment is not to replace conclusory allegations in pleading form with conclusory

2  allegations in an affidavit.  *Lujan*, 497 U.S. at 888; *cf. Anderson*, 477 U.S. at 249.  Bare

3  assertions unsupported by evidence do not preclude summary judgment.  *California*

4  *Architectural Bldg. Prods., supra.*

5                                        **DISCUSSION**

6  **A.    Responding to Complaints and Grievances**

7           Mr. Ayers alleges SCC "strategicly [sic] either does not respond to residential complaints

8  … of serious staff abuse or it provides a written responce [sic] that externalizes the staff conduct

9  directing blame back on the complaining resident."  ECF No. 15, at 5 ¶ 1.  Mr. Ayers alleges that

10 this results in "zero resolution" and "enables the victimization to continue," in violation of his

11 Eighth Amendment rights.  Defendants argue that Mr. Ayers's claim fails because he has failed

12 to allege that any named defendant personally participated in a deprivation of his rights; he fails

13 to demonstrate how SCC's failure to respond to his complaints resulted in any injury; and, the

14 evidence reflects that SCC did respond to his complaints.  ECF No. 110, p. 4.

15         Liability under § 1983 is premised on a defendant's personal participation in the

16 deprivation of a constitutional or other federal right.  *Arnold v. International Business Machines*

17 *Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981); *Leer v. Murphy*, 844 F.2d 628, 632-33 (9th Cir.

18 1988).  No defendant can be found vicariously liable under § 1983 pursuant to a theory of

19 *respondeat superior.  Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690-

20 94, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  "Vague and conclusory allegations of official

21 participation in civil rights violations are not sufficient to withstand a motion to dismiss."  *Ivey v.*

22 *Board of Regents of Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982).

REPORT AND RECOMMENDATION - 4

Mr. Ayers has made no allegation or produced any evidence that any named defendant personally participated in a deprivation of his rights in failing to process his complaints and grievances.   He has also failed to allege or produce evidence demonstrating how a failure to respond to his complaints resulted in any injury other than his unsubstantiated allegation that he was "victimized."  This statement is vague and conclusory and there are no further allegations or evidence to support it.  Furthermore, the undisputed evidence reflects that SCC did respond to Mr. Ayers' complaints.

According to Ted Sparkhul, the Quality Assurance Coordinator at the SCC, Mr. Ayers filed 140 grievances, complaints, constituent letters and memoranda.  ECF No. 111, ¶ 4.  SCC responds and investigates all resident grievances and allegations of mistreatment when a resident follows SCC's formal grievance policy or writes a letter to the Superintendent.  *Id.* at ¶ 3.  Mr. Ayers filed 81 grievances between January 2006 and August 2010.  *Id*. at ¶ 5.  The SCC responded to all of those grievances and found that 15 were substantiated.  *Id.*

For a grievance to be substantiated, there has to be reasonable evidence that a policy, procedure, or rule was not properly followed by staff or a resident.  *Id*.  Mr. Ayers appealed six of the grievances when he disagreed with the finding of the grievance coordinator.  *Id*.  Of those six, the quality assurance coordinator agreed with the grievance coordinator that the allegations were unsubstantiated.  *Id.*

From January 2006 through August 2010, Mr. Ayers filed 38 complaints alleging mistreatment.  *Id* at ¶ 6.  SCC determined three of those were substantiated and took appropriate action in response.  *Id*.  During the same time period, various SCC staff responded to 11 constituent letters that Mr. Ayers sent to either the Superintendent's office or other DSHS personnel and quality assurance staff responded to four memoranda Mr. Ayers sent to the

REPORT AND RECOMMENDATION - 5

1    quality assurance office.  *Id.* at ¶¶ 7, 8.  Mr. Ayers has a pattern of filing multiple grievances on

2    the same issue.  After responding multiple times to the same issue, the grievance coordinator

3    sometimes explained that further grievances on the same matter would be met with the same

4    response.  *Id.* at ¶ 9.

5         Based on the foregoing, the undersigned recommends that Defendants' motion for

6    summary judgment on Mr. Ayers's claim that SCC failed to respond to his complaints and

7    grievances be granted and that this claim be dismissed with prejudice.

8

9    **B.    Access to Courts – Limitation on Telephone Use and Photocopies**

10        **(1)    Limitation of Telephone Use.**  Mr. Ayers claims SCC violated his rights to

11   access the court by only allowing him one 20 minute legal phone call per day while he was in

12   IMU.  ECF No. 15, at 5 ¶ 3.

13        It is now established beyond doubt that prisoners have a constitutional right of access to

14   the courts.  *Bounds v. Smith*, 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).  In

15   addition, the right of access to the courts has been found to encompass the right to talk in person

16   and on the telephone with counsel in confidential settings.  *See, Hydrick v. Hunter*, 500 F.3d 978,

17   999 (9th Cir.2007); *Ching v. Lewis*, 895 F.2d 608, 609-10 (9th Cir.1990) ("The opportunity to

18   communicate privately with an attorney is an important part" of meaningful access to the courts.)

19   However, in order for plaintiff to state a denial of access claim, plaintiff must show that he

20   suffered an "actual injury" as a result of the defendants' actions.  *See Lewis v. Casey*, 518 U.S.

21   343, 354-55, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).  "In order to establish actual injury, the

22   inmate must demonstrate that official acts or omissions hindered his efforts to pursue a [non-

23   frivolous] legal claim."  *Phillips v. Hust*, 477 F.3d 1070, 1076 (9th Cir.2007) (quoting Lewis,

24   518 U.S. at 351, 353 (alteration in original)).  Further, the right of access to the courts is limited

25

26

REPORT AND RECOMMENDATION - 6

to "the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts." *Lewis*, 518 U.S. at 356.

The undisputed evidence in this case reflects that Mr. Ayers was provided with telephone access for 20 minutes per day. Moreover, there is no evidence that Mr. Ayers was actually injured or denied access to the courts or that any named defendant personally participated in a denial of his right to access the court by not providing him with more telephone access.

In addition, the court finds that this claim is duplicative of a claim Mr. Ayers raised in *Ayers v. Richards, et al*., Case No. C08-5390. In that case, Mr. Ayers alleges "he has been restricted to one 20-minute legal call per-day, and this served to be a violation of his reasonable access to the courts, and to the telephone." ECF No. 16-2, at 23 ¶ 1. That claim was dismissed. ECF No. 210, pp. 12-13 (Report and Recommendation); ECF No. 223 (Order Adopting Report and Recommendation).

**(2)** **Limitation of Photocopies.** Mr. Ayers also claims that defendants blocked his access to the courts by denying him the right to make photocopies of documents he needs to litigate *Ayers v. Richards, et al*., Case No. C08-5390. ECF No. 15, p. 8 ¶ 17. He alleges the defendants and defense counsel requested him to submit additional papers and pleadings but then defendants refused to allow him to copy those documents. *Id.*

The undersigned recommends dismissal of this claim because Mr. Ayers fails to allege which defendant personally participated in a violation of his rights. Moreover, the issue is moot as the court has already ruled on this issue. *See, Ayers v. Richards, et al*., Case No. C08-5390. In that case, Mr. Ayers moved the court to order SCC to make him photocopies because he claimed that the court had asked him to submit additional pleadings and papers. ECF No. 55 (Case No. C08-5390); ECF No. 110, Exh. 4 (this case).

REPORT AND RECOMMENDATION - 7

1    In the Order denying Mr. Ayers' motion, the court noted that Mr. Ayers misread the

2    deficiency notice from the court and the court was not ordering that Mr. Ayers file more papers

3    and pleadings.  ECF No. 79, p. 2, n. 2 (Case No. C08-5390); ECF No. 1108, Exh. 5 (this case).

4    The court declined to find that the defendants violated Mr. Ayers' ability to access the courts

5    based on the number of documents filed in that suit and in other pending lawsuits:

6
7            Plaintiff has filed voluminous pleadings since the inception of this case.
     Between June and November, 2008, Mr. Ayers filed 18 separate pleadings,
8    including a 130 page Complaint (Dkt. # 1), of which 82 pages are copies of
     various documents and exhibits that contain no allegations or causes of action.
9    Plaintiff is also prosecuting two civil lawsuits in this Court and an appeal in the
     Ninth Circuit.  Plaintiff has been able to file at least 45 pleadings in this Court and
10   the Ninth Circuit Court of appeals over a five-month period.

11   ECF No. 79 (Case No. C08-5390); ECF No. 110, Exh. 5 (this case).

12   The court takes judicial notice of the number of Mr. Ayers' filings in *Ayers v. Richards,*

13   *et al.*, C08-5390 and in this case, and concludes that Defendants have not violated Mr. Ayers's

14   right to access the courts.  Accordingly, Defendants' motion for summary judgment on this claim

15   should be granted and the claim dismissed with prejudice.

16
17   **C.    Medical Care – Dr. Bell**

18   Mr. Ayers claims Defendant Bell violated his rights by delaying transport to a hospital

19   for six days after Mr. Ayers broke his thumb.  ECF No. 15 at 5.  Defendants argue that this

20   claim should be dismissed because the facts do not support Mr. Ayers' allegation and because

21   this claim is duplicative of a claim filed by Mr. Ayers in another lawsuit in this court.  ECF No.

22   110, p. 14.

23   The Eighth Amendment requires prison officials to take reasonable measures to

24
25
26

REPORT AND RECOMMENDATION - 8

1  guarantee the health and safety of inmates.[2]  An official is deliberately indifferent to a serious

2  medical need if the official "knows of and disregards an excessive risk to inmate health or

3  safety." *Id.* at 837.  Deliberate indifference requires more culpability than ordinary lack of due

4  care for a prisoner's health.  *Id.* at 835.  In assessing whether the official acted with deliberate

5  indifference, a court's inquiry must focus on what the prison official actually perceived, not what

6  the official should have known.  *See Wallis v. Baldwin*, 70 F.3d 1074, 1077 (9th Cir. 1995).  If

7  one of the components is not established, the court need not inquire as to the existence of the

8  other.  *Helling*, 509 U.S. at 25.

9        Prison authorities have "wide discretion" in the medical treatment afforded prisoners.

10 *Stiltner v. Rhay*, 371 F.2d 420, 421 (9th Cir.), *cert. denied*, *Stiltner v. Washington*,

11 387 U.S. 922, 87 S. Ct. 2038, 18 L. Ed. 2d 977 (1967).  To prevail on an Eighth Amendment

12 medical claim, the plaintiff must "show that the course of treatment the doctors chose was

13 medically unacceptable under the circumstances . . . and the plaintiff must show that they

14 chose this course in conscious disregard of an excessive risk to plaintiff's health."  *Jackson v.*

15 *McIntosh*, 90 F.3d 330, 332 (9th Cir.), *cert. denied*, *McIntosh v. Jackson*, 519 U.S. 1029,

16 117 S. Ct. 584, 136 L. Ed. 2d 514 (1996).  A claim of mere negligence or harassment related to

17 medical problems is not enough to make out a violation of the Eighth Amendment.  *Franklin v.*

18 *State of Oregon, State Welfare Division*, 662 F.2d 1337, 1344 (9th Cir. 1981).  Simple

19 malpractice, or even gross negligence, does not constitute deliberate indifference. *McGuckin*,

20 974 F.2d at 1059.  Similarly, a difference of opinion between a prisoner-patient and prison

21 medical authorities regarding what treatment is proper and necessary does not give rise to a

---

[2] Although Mr. Ayers is not an inmate, cases involving prisoner's rights are instructive as applied to civilly detained persons.

REPORT AND RECOMMENDATION - 9

1

2

§ 1983 claim.  *Franklin*, 662 F.2d at 1344; *Mayfield v. Craven*, 433 F.2d 873, 874

(9th Cir. 1970).

3

4

5

6

7

8

9

10

11

12

13

14

15

16

On June 3, 2008, Mr. Ayers broke his thumb when he hit a telephone on his living unit.

ECF No. 15, p. 5 ¶ 4.   Mr. Ayers testified that Dr. Bell was not the person who assessed him on

the day of injury.  *Id.*, Exh. 1 (Ayers Deposition) at 135 ll. 1-25, 136 ll. 1-10.  According to Dr.

Sziebert, who reviewed Mr. Ayers' medical charge with regard to medical care he received for a

broken thumb, in less than three hours of sustaining his injury and complaining of pain, nursing

staff assessed Mr. Ayers's injury, gave him pain medication, and splinted his thumb.  ECF No.

116, p. ¶ 13[3].  A June 25, 2008 x-ray showed a fracture of Mr. Ayers' thumb.  *Id.*  The next day,

Mr. Ayers was transported to a hospital in the community for surgery on his thumb, returning to

SCC on June 7, 2008.  *Id.* at ¶ 14.  The surgery included putting temporary pins in his thumb to

assist in healing.  SCC nursing staff provided appropriate post-operative care, including changing

dressings.  *Id.*  When the wound was sufficiently healed, on July 31, 2008, Dr. Bell removed the

temporary pins and ordered that Mr. Ayers receive physical therapy.  *Id.* at ¶ 15.

17

18

19

20

21

22

According to Dr. Sziebert, there is nothing in Mr. Ayers' chart to indicate that the care he

received fell below the standard of care in the medical community.  *Id.*  Conversely, the

undisputed evidence reflects that Mr. Ayers received surgery, post-operative care, and a referral

for physical therapy, thus refuting any allegation that Dr. Bell's course of action was in

conscious disregard of an excessive risk to Mr. Ayers' health.  Mr. Ayers's allegation that Dr.

23

24

25

26

---

[3] In *Ayers v. Richards, et al.*, Case No. C08-5390 BHS/KLS, Dr. Sziebert submitted a declaration stating that Dr. Bell was SCC's Medical Director from March 2007 through July 2009.  ECF No. 176, ¶ 9.  His duties included patient care and managing SCC's medical program.  *Id.*  Dr. Sziebert, who is the staff psychiatrist at the SCC, has treated Mr. Ayers. *Id.*, ¶¶ 1, 3.  Dr. Sziebert has also reviewed Mr. Ayers' medical chart, which are kept in the ordinary course of business at SCC.  *Id.*, ¶ 10.

REPORT AND RECOMMENDATION - 10

Bell delayed in arranging a hospital transport for six days is immaterial as the undisputed

evidence reflects that Mr. Ayers had surgery on his thumb a few days after the incident.[4]

This claim may also be dismissed as it is duplicative of a claim made by Mr. Ayers in

another case pending before this court.  In that case, the undersigned recommended dismissal of

the claim:

> On June 3, 2008, Mr. Ayers broke his thumb when he punched a telephone
> on his living unit.  Dkt. 16-2, p. 23.  Mr. Ayers alleges that Dr. Bell refused to
> provide him with timely treatments for his broken thumb.  Dkt. 178-3, pp. 3-4.
>
> Mr. Ayers testified, however, that he was first seen by nursing staff on the
> day of his injury.  *Id.*  According to Mr. Ayers' medical chart, he broke his thumb
> on June 3, 2008 at 3:20 p.m. Dkt. 176, ¶ 10, Attachs. B-1, 2.  Within three hours
> of sustaining the injury and complaining of pain, Mr. Ayers was assessed by
> nursing staff, given pain medication, and had his thumb splinted.  Dkt. 176, ¶ 10.
> On June 5, 2008, Mr. Ayers received an x-ray of his thumb indicating a break.
> *Id.*, Attach. B-3.  On June 6, 2008, Mr. Ayers was transported to a hospital in the
> community for surgery on his thumb, and returned to SCC on June 7, 2008.  *Id.*,
> Attach. B-4.  The surgery included putting temporary pins in his thumb to assist in
> healing.  SCC nursing staff provided post-operative care and changed his
> dressings.  *Id.*, Attach. B-5.  On July 31, 2008, Dr. Bell removed the temporary
> pins and ordered that Mr. Ayers receive physical therapy.  *Id.*, Attach. B-6.  Mr.
> Ayers participated off and on in physical therapy sessions and those records
> indicate that the physical therapy relieved his symptoms.  *Id.*, Attach. B-7 through
> B-24.
>
> Mr. Ayers has presented no evidence to indicate that the treatment he
> received for his broken thumb was below the standard of medical care or that Dr.
> Bell acted in conscious disregard of an excessive risk to Mr. Ayers' health.
> Therefore, this claim should be dismissed with prejudice.

*See* ECF No. 210, pp. 18-19 in *Ayers v. Richards, et al.,* C08-5390 BHS/KLS.  This claim was

dismissed.  ECF No. 223 (Order Adopting Report and Recommendation).

A litigant "ha[s] no right to maintain two separate actions involving the same subject

matter at the same time in the same court and against the same defendant." *Walton v. Eaton*

---

[4] Mr. Ayers also claims that Randall Griffith denied Mr. Ayers medical care after an alleged assault by SCC
employee Jeremy Dorfner.  CEF No. 15 at ¶ 12.  However, Mr. Griffith is not a party in this lawsuit.

REPORT AND RECOMMENDATION - 11

*Corporation*, 563 F.2d 66, 70 (3d Cir. 1977); *see also Friends of the Earth, Inc. v. Crown Central Petroleum Corp.*, 95 F.3d 358, 362 (5th Cir. 1996).  When a plaintiff files a second complaint alleging the same claim as a prior, pending, related action, the second complaint may be dismissed.  *See Zerilli v. Evening News Ass'n*, 628 F.2d 217, 222 (D.C. Cir. 1980).

Thus, the court may also dismiss Mr. Ayers's claim against Dr. Bell for failure to provide timely treatments for a broken thumb because it is duplicative of the claim he makes against Dr. Bell here.

Based on the foregoing, the undersigned recommends that Defendants' motion for summary judgment on Mr. Ayers' claim that Dr. Bell failed to provide him with medical treatment for his broken thumb be granted and this claim dismissed with prejudice.

**D.      Retaliation – Dr. Sziebert[5]**

Mr. Ayers alleges that Dr. Sziebert retaliated against him by keeping him on a housing unit with dangerous residents.  He alleges Dr. Sziebert did this as punishment because Mr. Ayers continually filed grievances and lawsuits against Dr. Sziebert.  ECF No. 15, at 8 ¶ 18.  (Mr. Ayers's claim that Dr. Sziebert violated his Eighth Amendment rights by failing to separate Mr. Ayers from severely mentally ill residents in the Alder North and Alder West housing units at SCC is discussed separately in Paragraph E below).

The Ninth Circuit has consistently held that prison staff may not retaliate against inmates for exercising their constitutional rights to file lawsuits and grievances.  *Rizzo v. Dawson*, 778 F.2d 527 (9th Cir. 1983); *Barnett v. Centoni*, 31 F.3d 813 (9th cir. 1994); *Pratt v. Rowland*, 65 F.3d 802 (9th Cir. 1995); *Rhodes v. Robinson*, 408 F.3d 559 (9th Cir. 2005).  In order to establish

---

[5] In his complaint Mr. Ayers alleges SCC employees Walt Weinberg and Willie Stoddard also retaliated against him.  ECF No. 15, at 8 ¶¶ 18, 19.  However, neither of these individuals are parties to this lawsuit.

REPORT AND RECOMMENDATION - 12

a retaliation claim, an inmate must show that: 1) a state actor took some adverse action against the inmate; 2) because the inmate engaged in constitutionally protected conduct; 3) the adverse action chilled the inmate's exercise of First Amendment rights; and, 4) the adverse action did not reasonably advance a legitimate correctional goal.  *Rhodes*, 408 F.3d at 567-68.

To prevail on a First Amendment retaliation claim, a plaintiff must initially show that the protected conduct was a substantial or motivating factor in the defendant's decision. *Carepartners LLC v. Lashway*, 545 F.3d 867, 877 (9th Cir. 2008).  If the plaintiff makes this initial showing, the burden shifts to the defendant to establish that it would have reached the same decision even in the absence of the protected conduct.  *Id.*  To meet this burden, a defendant must show by a preponderance of the evidence that it *would* have reached the same decision; it is insufficient to show merely that it *could* have reached the same decision.  *Id.*

Retaliation is not proven by simply showing that a defendant prison official took adverse action after he knew that the plaintiff prisoner had engaged in constitutionally protected activity. Although timing can be considered as circumstantial evidence of a retaliatory event, timing alone cannot establish retaliation. *See Pratt v. Rowland*, 65 F.3d at 808.   As noted by one district court, "merely being aware of ongoing litigation does not establish that all adverse actions taken thereafter are retaliatory."  *Estrada v. Gomez*, 1998 WL 514068 * 3 (N.D. Cal. 1998).   The overall circumstances of the alleged retaliation must be considered and not simply the order of events.  *Id.*  The *Estrada* court's comments on inferring retaliatory motive through timing alone are instructive:

> The oversimplified "timing and knowledge" analysis has numerous problems. First, it presumes vindictiveness by the prison guard. Second, it elevates a prisoner who exercises his constitutional rights to a higher status: e.g., if a guard refuses to serve lunch to a prisoner who told him he filed a grievance and to a prisoner who had not done so, the former would have a retaliation claim and the

REPORT AND RECOMMENDATION - 13

latter would not. Third, it encourages litigiousness because, with planning, a prisoner could have constant federal court supervision of his tenure in prison. An industrious prisoner could file a grievance when he arrived at prison and perhaps weekly thereafter, broadcast his grievance-filing activities widely, and then file federal civil rights actions claiming that every later adverse action by a guard was retaliatory. The court would be asked to pass on the legitimacy of all actions the prisoner did not like. Fortunately, a closer look at the law of retaliation shows that the standard is slightly higher and the claim is not so susceptible to manipulation.

*Id.* at n. 2.

Viewing the evidence in the light most favorable to Mr. Ayers, the undersigned concludes that Mr. Ayers has established that he has filed many grievances and lawsuits against Dr. Sziebert.  However, Mr. Ayers has not established that his filing of lawsuits and grievances against Dr. Sziebert was a substantial or motivating factor in the decisions to house Mr. Ayers on the Alder North and West housing units.   Moreover, the undisputed evidence reflects that SCC officials would have reached the same decision to place Mr. Ayers on the Alder North and West housing units without regard to whether Mr. Ayers filed grievances or lawsuits.

According to Cathi Harris, decisions regarding resident housing assignments at SCC, including those regarding residents who are seriously mentally ill, are based on the professional judgment of SCC residential and clinical staff.  ECF No. 115 at ¶ 6.  Housing assignments are made by the placement committee, which is made up of four executive managers to include Cathi Harris, Don Gauntz, Carey Sturgeon and Leslie Sziebert.  Dr. Sziebert was a member of the committee that reached a consensus decision regarding in what living unit Mr. Ayers should reside, but Dr. Sziebert was not solely responsible for the decision.  *Id.* at ¶ 6; ECF No. 116 at ¶ 16.

Residents are assigned to one of eight different living units based first on their degree of medical acuity and second, on their level of treatment participation.  ECF No. 115 at ¶ 7.  In

REPORT AND RECOMMENDATION - 14

this manner, SCC seeks to ensure that each resident is placed in a unit that facilitates not only

his individualized treatment, but also facilitates the treatment of other residents by avoiding

cohabitation that could jeopardize the progress of discrete populations.  *Id.*  SCC also considers

whether a resident's mental illness or challenging behavior might affect his ability to control

his conduct appropriately on a particular living unit, whether the resident's serious mental

illness may make him vulnerable to abuse from other residents, and the level of staffing

appropriate for that resident.  *Id.* at ¶ 8.  The professional judgment exercised includes

considering the separation of special needs (including those residents who are developmentally

disabled, medically fragile, or diagnosed with major mental illnesses) and non-special needs

residents to allow more opportunities for individualized therapeutic interaction, as there are

generally fewer residents per unit, the staff is generally trained for working with special needs,

and the units provide more treatment-consistent environmental cues.  *Id.* at ¶ 9.

SCC has designated the Alder North housing unit as a "high structure-high security

unit."  It provides a highly structured environment for residents who are demonstrating

disordered behavior and who suffer from severe mental illness and/or personality disorder and

who may exhibit a low degree of function or self-control.  *Id.* at ¶ 10.  The Alder West unit is

designed for residents who require a high level of behavior intervention and who are not

participating in the sex offender specific treatment program.  *Id.* at ¶ 11.  In addition, these

residents have also actively interfered in other residents' treatment.  *Id.*

SCC placed Mr. Ayers on the Alder North and Alder West housing units because the

placement committee determined, based on the professional judgment of its members, that

Mr. Ayers needed to be in a highly structured environment because of his ongoing behavioral

issues.  ECF No. 116 at ¶ 17.  Mr. Ayers suffers from a number of psychiatric conditions

REPORT AND RECOMMENDATION - 15

including Paraphilia Not Otherwise Specified, Bipolar Disorder by history, Polysubstance

Abuse, and Antisocial Personality Disorder (Significant Psychopathy). *Id.* at ¶ 4. While at the

SCC, Mr. Ayers engages in chronic loud, aggressive, hostile, racial, and violent communications

and behaviors. *Id.* at ¶ 18. Mr. Ayers' treatment team has had to address Mr. Ayers' behaviors

through behavioral management because he refuses to engage in any therapeutic process that

could assist him to manage his volatile mood and emotional dysregulation. His severe emotional

and behavioral dysregulation cause him exposure to risk of harm from other residents who feel

threatened and victimized. *Id.*

For example, since his commitment in 2005, Mr. Ayers has assaulted multiple staff

members. *Id.* at ¶ 19. From February 2006 through August 2006, Mr. Ayers received multiple

Behavior Management Reports (BMRs) for disruptive behavior, refusing staff direction, eluding

supervision, purchasing items from other residents, threatening, intimidation, extortion, verbal

harassment, and delaying staff in their duties. From September 2007 to August 2008, Mr. Ayers

received 32 BMRs for incidents denominated as "specifically problematic." *Id.* When deciding

where to place Mr. Ayers, the placement committee considered the fact that he was frequently

resistant and hostile to staff, engaged in verbal and physical intimidation of staff and peers, did

not engage in treatment, and at times required almost constant supervision. ECF No. 116 at ¶ 20.

It was the professional opinion of SCC staff that it was not appropriate or safe to place Mr. Ayers

on a medium or low management unit. *Id.* at ¶ 21.

Due process guarantees civilly detained sexually violent predators access to mental

health treatment that provides them an opportunity to be cured or to improve the mental

conditions for which they are confined. *Sharp v. Weston*, 233 F.3d 1166, 1172 (9th Cir. 2000).

Whether this right has been violated is determined by balancing the patient's liberty interests

REPORT AND RECOMMENDATION - 16

against the relevant state interests. *Youngberg v. Romeo*, 457 U.S. 307, 321, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982).  In order to achieve this balance, courts must look to see if "professional judgment" was exercised; if so, the state's actions are presumptively valid. *Id.* at 321, 323.  Liability will only be imposed if "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323.

The professional judgment standard is not concerned with what would make patients happier or more productive. *Society For Good Will To Retarded Children, Inc. v. Cuomo*, 902 F.2d 1085, 1090 (2d Cir. 1990).  Instead, professional judgment is concerned with whether a decision has "substantially met professionally accepted minimum standards." *Id.*  For example, even if the evidence shows an alternative treatment decision might be better, courts may not impose liability so long as professional judgment was exercised. *Id.*

One of the treatment decisions governed by this professional judgment standard is ward placement within a treatment facility. *See Houghton v. South*, 965 F.2d 1532 (9th Cir. 1992) (using professional judgment standard in evaluating patient's request to be moved from facility's maximum security unit to a less restrictive unit).

Viewing the evidence in the light most favorable to Mr. Ayers, the undersigned concludes that Mr. Ayers has not met his burden of showing that filing grievances and lawsuits against Dr. Sziebert was a substantial or motivating factor in Dr. Szieberts' opinion that Mr. Ayers should be placed on the Alder North and West housing units.  It is undisputed that Dr. Sziebert was not solely responsible for Mr. Ayers's placement.  And, Defendants have presented

1    undisputed evidence that the SCC placement committee would have placed Mr. Ayers on the

2    Alder North and West housing unit because of Mr. Ayers's extreme behaviors.

3        Accordingly, the undersigned recommends that Defendants' motion for summary

4    judgment on this claim be granted and that this claim be dismissed with prejudice.

5    **E.    Claim of Deliberate Indifference – Dr. Sziebert[6]**

6        Mr. Ayers claims Dr. Sziebert violated his rights by failing to separate Mr. Ayers from

7    severely mentally ill residents in the Alder North and Alder West housing units at SCC and

8    that this alleged failure resulted in Mr. Ayers being assaulted by other residents and caused him

9    to suffer intense emotional distress.  ECF No. 15, p. 7 ¶ 15.7   Mr. Ayers claims that Dr.

10   Sziebert, through deliberate indifference, "allowed instances that placed [him] in dangerous

11   predicaments where [he] had been attacked and injured."  ECF 178-4, Exh. 3 (II Ayers Dep. at

12   91 ll. 9-17).  Mr. Ayers alleges that Dr. Sziebert put him in harm's way by allowing "the reported

13   incidents to perserverate [sic] continuously."  *Id.*

14       To impose liability on the defendants for the incidents where other residents assaulted

15   Mr. Ayers, he must show that defendants acted with deliberate indifference with regard to

16   threats to his safety.  *Redman v. County of San Diego*, 942 F.2d 1435, 1443 (9th Cir. 1991).  To

17   prevail in an Eighth Amendment context the test he must satisfy is whether the defendants

18   acting with deliberate indifference exposed him to a sufficiently substantial "risk of serious

19   damage to his future health."  *Farmer*, 511 U.S. at 843 (quoting *Helling*, 509 U.S. at 35).  To

20   show deliberate indifference, a plaintiff must show a defendant's knowledge of a serious harm

21   and that the defendant acted or failed to act despite that knowledge.  *See Farmer*, 511 U.S.

---

[6] Mr. Ayers includes SCC employee Walt Weinberg in his allegations regarding his housing assignment.  However, Mr. Weinberg is not a party to this action.

REPORT AND RECOMMENDATION - 18

at 842.  Even with knowledge of the risk, and with an injury occurring as a result of the risk, liability may not be imposed if the defendant shows he acted reasonably in the face of the risk. *Id*. at 844.

Mr. Ayers does not allege nor does he provide evidence to support an allegation that Dr. Sziebert knew of a serious harm and that he failed to act despite that knowledge.  Mr. Ayers' complaint does not detail when he was assaulted by other residents and what, if anything Dr. Sziebert knew and failed to act upon.   As noted by Defendants, the court need not search for evidence or manufacture arguments for a plaintiff. *See Entertainment Research Group, Inc.* ("[w]e will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim . . . .'[j]udges are not like pigs, hunting for truffles buried in briefs.'") *Entertainment Research Group, Inc. v. Genesis Creative Group, Inc*., 122 F.3d 1211, 1217 (9th Cir. 1997); *quoting Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994).

In addition, the court notes that in *Ayers v. Richards, et al*., No. C08-5390, Mr. Ayers alleged that Dr. Sziebert treated him with deliberate indifference after other residents assaulted Mr. Ayers on September 11, 2007, May 9, 2008, and September 25, 2008.   This claim has been dismissed.  ECF No. 210 in Case C08-5390 (Report and Recommendation); ECF No. 223 (Order Adopting Report and Recommendation).

Finally, to the extent that Mr. Ayers' claim could be understood to be a constitutional challenge to his room assignment, Defendants have provided undisputed evidence that the assignment resulted in the exercise of professional judgment.  ECF No. 116 at ¶ 17.

Using the standards annunciated in *Youngberg* as stated above, and viewing the evidence before the court in the light most favorable to Mr. Ayers, the court finds that the decision to

REPORT AND RECOMMENDATION - 19

assign Mr. Ayers to a specific room was made in the exercise of professional judgment.   As

noted by the Ninth Circuit in *Houghton*, 965 F.2d 1532:

> According to *Youngberg*, a "decision, if made by a professional, is presumptively
> valid; liability may be imposed only when the decision by the professional is such
> a substantial departure from accepted professional judgment, practice, or
> standards as to demonstrate that the person responsible actually did not base the
> decision on such a judgment." *Id.* at 323, 102 S.Ct. at 2462 (footnotes omitted).
> We have previously held that "this standard is equivalent to that required in
> ordinary tort cases for a finding of conscious indifference amounting to gross
> negligence." *Estate of Conners v. O'Connor*, 846 F.2d 1205, 1208 (9th Cir.1988)
> *(Estate of Conners), cert. denied*, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d
> 808 (1989).  Courts are to perform the review required by *Youngberg* without
> substituting their own views for those of the professionals.  Therefore, we hold
> that courts must restrict their inquiry to two questions: (1) whether the
> decisionmaker is a qualified professional entitled to deference, and (2) whether
> the decision reflects a conscious indifference amounting to gross negligence, so as
> to demonstrate that the decision was not based upon professional judgment.

*Hougton*, 965 F.2d 1532, 1536.

There is no evidence that the exercise of this professional judgment did not meet

professionally accepted minimum standards.  The professional qualifications of Dr. Sziebert

and/or other members of the placement committee are not in dispute and there is no evidence that

they acted in conscious indifference amounting to gross negligence, so as to demonstate that the

decision was not based upon professional judgment.  Accordingly, the undersigned recommends

that Defendants' motion for summary judgment on this claim be granted and the claim dismissed

with prejudice.[7]

**F.      Excessive Force Claim - Defendant Steinbach**

Mr. Ayers alleges that he sustained "two 1-inch contusions" when Defendant Steinbach

---

[7]There is also no clearly established fundamental right to not be housed with other sexually violent predators with
major mental illnesses.  In fact, persons confined pursuant to RCW 71.09, are described as those who suffer from a
"mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual
violence if not confined in a secure facility."  *See,* RCW 71.09.020(16).

REPORT AND RECOMMENDATION - 20

closed a cuff-port door on his arm.  Mr. Ayers describes the cuff-port door as a sharp, jagged

slot.  ECF No. 15, p. 6.  Mr. Ayers alleges that the discomfort caused by Defendant Steinbach

slamming the cuff-port door on his arm lasted for fourteen days and that he is physically scarred

for life.  *Id.*  In his affidavit, Mr. Ayers describes the incident as follows:

> RRC Steinbach orchestrated an harassment situation while I was in the (IMU) for
> the false Garcia assault incident by repeatedly badgeringly [sic] asking me
> whether I wanted my lunch. Even though following each time I was asked this
> question by Steinbach, I responded in my usual affirmative manner by asking him
> to "just open the cuffport and put my food in." He then intentionally and very
> annoyingly, and consciously so, walked away from my (IMU) door as though I
> hadn't affirmatively responded to his question. Steinbach did this to create the
> impression as though I had refused my lunch, and that the lunch meal would be
> thrown in the trash. Even though he was totally aware that his repeated acts were
> causing me great emotional anguish, he continued to verbally irritate this plaintiff
> to the point where upon finally receiving the said meal I threw a fresh cup of
> orange drink on him through the cuff port. Immediately following this, as I
> attempted to pull my right arm back into my (IMU) cell, he quickly reached,
> grabbing the heavy, jagged edged cuffport door, and maliciously slammed my
> forearm in the cuffport and pinned my arm there, forcing me to painfully cut
> myself as I worked my arm back. My right forearm ached and throbbed to the
> bone for one week following this engeneered [sic] assault. (RRC) Riley was
> present and witnessed this turn of events. She also had been shown my injuries
> sustained from this because I called and asked her to look at the cuts that I
> received from this assault.

ECF No. 61, p. 5, ¶¶ 3-6.

When evaluating whether excessive force was used, "the core judicial inquiry is . . .

whether force was applied in a good faith effort to maintain or restore discipline, or maliciously

and sadistically to cause harm." *Hudson v. McMillan*, 503 U.S. 1, 7, 112 S. Ct. 995, 117 L. Ed.

2d 156 (1992).  In determining whether the use of force was wanton and unnecessary, it may

also be proper to evaluate the need for application of force, the relationship between that need

and the amount of force used, the threat reasonably perceived by the responsible officials, and

any efforts made to temper the severity of a forceful response. *Id.* (internal quotation marks and

REPORT AND RECOMMENDATION - 21

citations omitted).  However, not "every malevolent touch by a prison guard gives rise to a

federal cause of action."  *Id*. at 9.  "The Eighth Amendment's prohibition of cruel and unusual

punishments necessarily excludes from constitutional recognition *de minimus* uses of physical

force, provided that the use of force is not of a sort repugnant to the conscience of mankind."

*Hudson,* 503 U.S. at 9-10 (internal quotation marks and citations omitted).  "The absence of

serious injury is . . . relevant to the Eighth Amendment inquiry, but does not end it."  *Id*. at 7.

According to Dr. Leslie Sziebert, SCC's staff psychiatrist, certain protocols were in place

when meals were delivered to Mr. Ayers on his living unit.  ECF No. 51, p. 2.  SCC residents

normally receive their meals in the SCC dining room at scheduled times each day.  *Id.*  When a

resident had a medical or behavioral problem that prevents him from traveling to the dining

room, with staff approval, the resident may receive his meal on his living unit.  Meals on unit are

limited to necessity because the SCC has had on-going issues with residents using food products

from meals to brew alcohol (called 'pruno").  Pruno presents a significant security hazard to staff

and residents, particularly when a resident under the influence of pruno acts out.  *Id.*  Mr. Ayers

has a history of hoarding food in his bedroom.  Thus, when he receives meals on unit, residential

staff are instructed to require Mr. Ayers to dispose of the remains of his earlier meal before staff

will deliver to him his next meal thereby avoiding allowing Mr. Ayers to possess the ingredients

to manufacture pruno.  *Id.*, pp. 2-3.

On August 8, 2008, Defendant Steinbach and another Residential Rehabilitation

Counselor (RRC) Joscelyn Riley, brought Mr. Ayers his lunch on the Intensive Management

Unit (IMU).   ECF 112 (Declaration of Richard Steinbach), at ¶ 2; ECF No. 113 (Declaration of

Joscelyn Riley), at ¶ 2.  Ms. Riley was holding the food tray.  ECF No. 112 at ¶ 2; ECF No. 113

at ¶ 3.  Mr. Steinbach approached the door and asked Mr. Ayers if his breakfast tray had been

disposed of.  ECF No. 112, at ¶ 2.   Mr. Ayers was required to dispose of the remains of his

meals before he could receive his next meal because of his history of hoarding food.  *Id.* at ¶ 2.

Mr. Ayers responded by stating, "open the cuff-port."  *Id.*  Mr. Steinbach repeated his question

approximately two more times before Mr. Ayers said, "I already threw it away."  Mr. Steinbach

said "ok thank you. That's all I was asking."   According to Mr. Steinbach, he was not

purposefully trying to agitate Mr. Ayers in order to orchestrate the situation that followed.  *Id.*

Mr. Steinbach then opened the cuff-port door and Ms. Riley began handing Mr. Ayers his

meal.  ECF No. 112 at ¶ 3.  As Ms. Riley set his drink down, Mr. Ayers grabbed the cup and

threw it at Mr. Steinbach, hitting Mr. Steinbach and Ms. Riley with the liquid in the cup.  *Id.*;

ECF No. 113 at ¶ 3.  Mr. Ayers also pushed his lunch off the cuff-port.  Mr. Ayers held his arm

through the cuff-port and was swinging his arm in what Mr. Steinbach and Ms. Riley thought

was an attempt to grab Mr. Steinbach or Ms. Riley.  ECF No. 112 at ¶ 4; ECF No. 113 at ¶ 4.

Mr. Steinbach was concerned for his safety and that of his fellow employee.  ECF No. 112 at ¶ 4.

Mr. Steinbach attempted to close the cuff-port and that is when Mr. Ayers' arm was struck by the

cuff-port door.  *Id.*; ECF No. 113 at ¶ 5.  The cuff-port door fell open and Resident Ayers pulled

his arm back into his room and Mr. Steinbach shut the cuff-port.  *Id.*

The cuff-port door is a smooth metal surface about three-quarters of an inch thick and is

approximately six inches tall by twelve inches wide.  ECF No. 112 at ¶ 5.  The door is hinged at

the bottom so when SCC staff open it, it folds out, away from the door, stopping so that it is

parallel to the floor, creating a ledge.  To close the cuff-port, SCC staff push the door up and

lock it into place.  Due to the condition of the door hinge, it takes a moderate amount of force

to push it closed. If the door is not locked, it falls back into the parallel position.  *Id.*

REPORT AND RECOMMENDATION - 23

According to Kim Deitch, a registered nurse at the SCC who reviewed Mr. Ayers' medical charts, a nurse attempted to assess Mr. Ayers for any injury shortly following the incident but when she approached Mr. Ayers' room, he called her a "fucking bitch," "don't hide behind the cuff-port you fucking bitch," "I am hurt," and "send a male nurse or doctor." The nurse was not able to evaluate Mr. Ayers. He did not seek any medical attention for any injury related to his arm in the following days. ECF No. 114 at ¶ 2.

Mr. Steinbach states that he did not close the cuff-port door in a deliberate attempt to cause pain, injury, or to retaliate against Mr. Ayers but rather responded in what he thought was a reasonable and proportionate manner considering the harm Mr. Ayers posed to staff. *Id.* at ¶ 6. Due to Mr. Ayers' history of assaulting residents and staff and his prior specific threats against him, Mr. Steinbach states that he had a reasonable fear that Mr. Ayers was attempting to harm him and his colleague and he used the minimum force he thought was necessary to prevent injury to himself and Ms. Riley. *Id.*

Before this incident, Mr. Steinbach had worked on the IMU unit for three years and had significant contact with Mr. Ayers. *Id.* at ¶ 7. Mr. Steinbach was aware that Mr. Ayers was frequently involved in verbal and physical confrontations with other SCC residents and staff. Mr. Steinbach also witnessed a number of incidents where Mr. Ayers became assaultive or threatened staff. *Id.* For example, in October 2007, Mr. Steinbach and another RRC approached Mr. Ayers to deliver some paperwork. *Id.* at ¶ 8. Mr. Ayers told Mr. Steinbach and the other RRC, "don't come near me with that, she's just trying to harass me. Tell that bitch to shove it up her ass." *Id.* In another incident a few months later, Mr. Ayers became irate after Mr. Steinbach told him he would have to wait a few minutes for a staff meeting to be over before Mr. Steinbach could place a phone call for Mr. Ayers. *Id.* ¶ 9. Mr. Ayers then

REPORT AND RECOMMENDATION - 24

kicked a door.  Mr. Steinbach asked Mr. Ayers to return to his room three times, which

Mr. Ayers refused to do, continuing to kick the door.  Mr. Steinbach had to call security. *Id.*

The following month in January 2008, Mr. Steinbach entered the IMU and Mr. Ayers

called out to him, "hey bitch, come over here" and then proceeded to tell Mr. Steinbach that he

hoped he could "control himself from slapping the shit out of [him]."  *Id.* at ¶ 10.  In February

2008, in response to Mr. Steinbach's repeated request to remove his sunglasses indoors, Mr.

Ayers told Mr. Steinbach, "you gonna have more problems then you ever had in your life."  *Id.*

In March 2008, Mr. Steinbach had to call security after Mr. Ayers became very agitated, yelling

at Mr. Steinbach "fuck you" and leaning over the staff desk in a way that Mr. Steinbach thought

was an attempt to physically confront him.  *Id.* at ¶ 11.  Later that month, Mr. Steinbach was

present while another RRC talked to Mr. Ayers about Mr. Ayers's issues with Mr. Steinbach.

Mr. Ayers said he was going to put his hands on him, meaning Mr. Steinbach, and responded

affirmatively when asked if he was threatening to assault staff.  When the other RRC asked Mr.

Ayers what could be done to resolve the situation, Mr. Ayers said, "yeah, I'm going to grab

Steinbach by the collar and shake him like a little boy."  The RRC directed Mr. Ayers back to his

room and as he passed Mr. Steinbach, he looked him directly in the eye and said, "I'm gonna

grab you by the collar and shake you like a little baby."  *Id.*

In June 2008, Mr. Steinbach witnessed Mr. Ayers break his thumb while punching a

telephone during an angry outburst and Mr. Steinbach knew that Mr. Ayers was in IMU that

month for assaulting staff.  *Id.* at ¶ 12.  Lastly, on the morning of the cuff-port incident,

Mr. Steinbach knew that Mr. Ayers was in IMU because he had assaulted another resident.  *Id.*

Mr. Ayers does not dispute his history of assaulting residents and staff and his prior

specific threats against Defendant Steinbach.  He does not dispute that he threw a cup of juice at

REPORT AND RECOMMENDATION - 25

Defendant Steinbach and Ms. Riley.  However, he maintains that the cuff-port is "sharp and jagged," where Defendant Steinbach states that it is a smooth metal surface.  Mr. Ayers also states that Mr. Steinbach "maliciously slammed [his] forearm in the cuffport and pinned [his] arm there, forcing [him] to painfully cut [himself] as he worked [his] arm back.  ECF No. 15, p. 5.

Assuming for purposes of this motion that Mr. Ayers' allegations are true, there is ample undisputed evidence in the record reflecting that Mr. Steinbach reasonably perceived Mr. Ayers as a possible threat to himself and his co-worker.   And, although Mr. Ayers states that the cuff-port was jagged and he painfully cut himself, it is also undisputed that Mr. Ayers refused medical treatment for his arm on the day of the incident and did not seek medical treatment for any injury related to his arm in the following days.

Accordingly, even viewing the evidence in the light most favorable to Mr. Ayers, the undersigned finds that the undisputed evidence reflects that Mr. Ayers was a perceived threat, that the threat was reasonably perceived based on his history of assaultive behavior, and that the amount of force was *di minimus* and not the sort repugnant to the conscience of mankind. Accordingly, Defendants' motion for summary judgment on this claim should be granted and Mr. Ayers' claims against Defendant Steinbach for excessive force be dismissed with prejudice.

**G.    Due Process Claim for Retention in IMU for 41 Days**

Mr. Ayers alleges that he was placed in administrative segregation in the SCC's IMU for 41 days without a hearing which he asserts violated his due process rights.  ECF No. 15, p. 5, ¶ 2.  Defendants argue that the court should dismiss this claim because Mr. Ayers does not allege that a particular defendant is responsible for his placement in IMU and/or conducting such a hearing and thus has failed to allege that any defendant personally participated in a violation of

REPORT AND RECOMMENDATION - 26

his constitutional rights.   Defendants also argue that Mr. Ayers's claim is defective because he had no due process right to a hearing as his placement in IMU was non-punitive and for administrative purposes.

**(1)     Procedural Due Process**

According to Cathi Harris, Associate Superintendent of SCC, SCC uses administrative placement as a means to address institutional safety and security requirements.  ECF No. 115 at ¶ 3.  Examples of when SCC uses administrative placement are: to protect others when a resident willfully creates a serious risk of harm to others, when a resident has engaged in activity that is a threat to institutional safety or security, or when a resident has engaged in conduct that could be the subject of criminal prosecution and a referral for prosecution or outside investigation has or will be made within a reasonable time.  *Id.*  The superintendent is responsible for approving a resident's stay in IMU for longer than 72 hours.  *Id.* at ¶ 4.  Release criteria from IMU includes but is not limited to: having a safety plan in place to protect others, the ability to control a resident's behavior in a less restrictive environment, and law enforcement declining to prosecute the resident for his behavior.  *Id.* at ¶ 5.

In this case, SCC placed Mr. Ayers in IMU on June 1, 2008, after Mr. Ayers assaulted a staff member, Mr. Jose Garcia.  ECF No. 116 (Declaration of Leslie Sziebert, M.D.) at ¶ 5.  At that time, SCC staff determined that Mr. Ayers needed to be separated from the rest of the SCC population to preserve institutional security due to the threat he posed to SCC staff and residents.  *Id*.  Mr. Ayers' placement in IMU continued until July 23, 2008.  Mr. Ayers stayed in IMU during this time because he continued to threaten staff and displayed an inability to control his behavior.  SCC staff did not think they could control or manage Mr. Ayers' behavior on a regular living unit.  *Id.* at ¶ 6.

REPORT AND RECOMMENDATION - 27

1    The court takes judicial notice, based on an affidavit previously filed by Dr. Sziebert in

2    an unrelated case, that SCC's IMU is comprised of six resident bedrooms in the Alder South

3    Housing Unit and that residents placed in IMU are segregated from the rest of the SCC

4    population.[8]   In a previously filed affidavit in this case, Dr. Sziebert explained that when a

5    resident is in administrative segregation, the resident is allowed to leave the room to shower or

6    for outdoor recreation.   ECF No. 51, p. 3.

7          As SCC's staff psychiatrist, Dr. Sziebert was part of the team involved in managing

8    Mr. Ayers' behaviors while he was in IMU.   Dr. Sziebert evaluated whether it was safe for

9    Mr. Ayers to leave IMU and approximately every seven days, generated a document called

10   "current conditions."   *Id.* at ¶ 7.   A current conditions document provides direction to staff

11   about any special circumstances or rules that may apply to a particular resident.   *Id.*   Current

12   conditions generally are temporary and change as a resident's acute behavioral or medical

13   needs change.   *Id.* at ¶ 8.   In evaluating Mr. Ayers and updating his current conditions,

14   Dr. Sziebert relied on the observation reports, progress notes, and Behavioral Management

15   Reports (BMRs) that were generated during this time, consultations with the psychology

16   associate who visited Mr. Ayers, Dr. Sziebert's own knowledge of Mr. Ayers' history and his

17   evaluation of Mr. Ayers after visiting him in the IMU.   *Id.* at ¶ 9.

18         Dr. Sziebert states that he considered the following behaviors of Mr. Ayers in evaluating

19   whether it was safe for Mr. Ayers to leave IMU: (1) two days after placement on IMU, Mr.

20   Ayers broke his thumb punching an SCC telephone after being told he needed to end his phone

21   call; (2) an incident during which Mr. Ayers continually kicked doors because he wanted to

22   speak to a supervisor; (3) Mr. Ayers repeatedly screaming at staff if he did not get his way or he

---

[8] Affidavit of Leslie Sziebert, M.D., in Knerr v. Richards, No. C08-5021RJB (ECF No. 69).

REPORT AND RECOMMENDATION - 28

believed staff's response was not as fast as he would like; (4) on June 19, 2008, Mr. Ayers screamed obscenities for over an hour.  He yelled at an RRC that she was "a nasty ass bitch with no morals," "you're setting up others to get killed," "I'll kill them because you're an inconsiderate nasty bitch," and "it will be your fault when I kill them"; (5) a psychology associate who visited Mr. Ayers and others in the IMU noted that one time Mr. Ayers was screaming so loudly that it was difficult to understand the resident the staff person was talking to. Another time when the staff member tried to speak with Mr. Ayers, Mr. Ayers yelled obscenities and could not be redirected.  On July 1, 2008, the staff member was in a meeting down the hall from Mr. Ayers' room.  He could hear Mr. Ayers screaming obscenities through the walls and vents for approximately 20 minutes; (6) on July 13, 2008, Mr. Ayers stated to another staff member that after being released from SCC "the first chance I get I'm going to get RRC2 W. Graves. I know I'm going to be in trouble, so what. I will go back to DOC for an assault on staff, do my time there, and then I would be released;" (7) on one occasion when staff was delivering meals, Mr. Ayers threw his drink down on the ground, saying he didn't want it because the staff member wasn't wearing gloves; (8) while Mr. Ayers was in IMU, he received five BMRs for various behaviors including verbal harassment, refusing direction, refusing a strip search, possessing contraband, disruptive behavior, and delaying staff for the incident on July 20, 2008, noted above; and, (9) unauthorized items found on several occasions in Mr. Ayers' IMU room during room searches, including two razor blades taped together and secreted under the batteries in the battery compartment of a remote control.  *Id.* at ¶ 10.

    In the professional opinion of SCC staff during this time, Mr. Ayers' behaviors were so out of control that he was not safe to be out of IMU.  He repeatedly used threatening body language, a loud or screaming voice, used obscenities to try and intimidate staff, threatened

REPORT AND RECOMMENDATION - 29

staff, and generated situations wherein staff had to choose between allowing Mr. Ayers to pose

a threat to himself and others, or controlling his behaviors.  When Mr. Ayers' behaviors

subsided and SCC mental health staff believed it was safe for other residents and staff,

Mr. Ayers was removed from IMU.  *Id*. at ¶ 11.

The Ninth Circuit analyzes the constitutional rights of civilly committed individuals

using the same standard that applies to pretrial detainees.  *Jones v. Blanas*, 393 F.3d 918, 931-32

(9th Cir. 2004), *cert. denied, sub nom. County of Sacramento, Cal. v. Jones*, 546 U.S. 820, 126 S.

Ct. 251, 163 L. Ed. 2d 61 (2005).  Pretrial detainees have a procedural due process right to a

hearing when they are segregated for disciplinary reasons.  *Mitchell v. Dupnik*, 75 F.3d 517, 523-

26 (9th Cir. 1996) (pretrial detainee may not be subjected to disciplinary segregation as

punishment for violation of jail rules and regulations without notice and a hearing, *i.e.*, without

the procedural requirements of *Wolff v. McDonnell*, 418 U.S. 539 (1974)).

Defendants argue that the *Mitchell* standard for procedural due process is factually

distinguishable from the facts in this case as Mr. Ayers was not subjected to "discipline" for

violation of SCC rules.  Instead, he was placed on IMU status based on the professional

judgment of SCC staff that Mr. Ayers needed to be separated from the rest of the SCC

population to preserve institutional security due to the threat he posed to SCC staff and residents

after Mr. Ayers physically assaulted a staff member so seriously that the matter was referred to

law enforcement for prosecution.  ECF No. 116 at ¶ 5.  He was kept in the IMU thereafter

because of his continued aggressive, verbally assaultive, and threatening behaviors.  Mr. Ayers

provides no evidence to the contrary.

While the Due Process Clause protects pretrial detainees from punishment, not every

disability imposed during pretrial detention constitutes "punishment" in the constitutional sense.

REPORT AND RECOMMENDATION - 30

1   *Bell v. Wolfish*, 441 U.S. at 537.  Thus, the test to be applied in determining whether particular

2   restrictions and conditions imposed as a result of pretrial detention amount to punishment in the

3   constitutional sense is whether there was an express intent to punish, or "whether an alternative

4   purpose to which [the restriction] may rationally be connected is assignable for it, and whether it

5   appears excessive in relation to the alternative purpose assigned [to it].  *Id.* at 538 (quoting

6   *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-169 (1963).   The Supreme Court has

7   recognized that "maintaining institutional security and preserving internal order and discipline

8   are essential goals that may require limitation or retraction of the retained constitutional rights of

9   both convicted prisoners and pretrial detainees."  *Bell v. Wolfish*, 441 U.S. at 546.  The Supreme

10  Court has further recognized that prison administrators "should be accorded wide-ranging

11  deference in the adoption and execution of policies and practices that in their judgment are

12  needed to preserve internal order and discipline and to maintain institutional security."  *Bell v.*

13  *Wolfish*, 441 U.S. at 547.

14          Here, the evidence reflects that SCC uses administrative placement as a means to address

15  institutional safety and security requirements and that residents are placed in administrative

16  placement, for example, when a resident poses a serious risk of harm to others or has engaged in

17  conduct that could be the subject of a criminal prosecution and a referral for prosecution or

18  outside investigation has or will be made within a reasonable period of time.   It is undisputed

19  that Mr. Ayers was initially placed in the IMU because he assaulted a staff member and the

20  assault was referred to law enforcement for prosecution.  It is undisputed that Mr. Ayers's

21  placement in the IMU was monitored approximately every seven days and that a written report

22  was generated relating to any special circumstances or rules that might apply to his continued

23  segregation.  It is undisputed that Mr. Ayers continued to display aggressive, threatening and

REPORT AND RECOMMENDATION - 31

assaultive behavior that his treating psychiatrist concluded that it was not safe to allow Mr. Ayers to leave the IMU.  These behavior included breaking his thumb on a telephone, kicking doors, screaming obscenities at staff, threatening to kill others, refusing a strip search, and possessing contraband.

Conversely, there is no evidence that Mr. Ayers's actual placement in the IMU amounted to an "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *See, e.g. Sandin v. Connor*, 515 U.S. 472, 484, 115 S. Ct. 2293 (1995).  The undisputed evidence shows that he was placed in a bedroom unit, that he was able to leave to shower and/or recreate and to use the telephone.  The only apparent difference between the IMU and other housing units in the SCC appears to be that when a resident is in IMU he cannot congregate with other residents.  These restrictions or deprivations are not sufficient to constitute "atypical and significant hardship ... in relation to the ordinary incidents of prison life."  *Cf. Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir.1996) (what egregious condition or combination of conditions or factors would meet *Sandin* test requires case by case, fact by fact consideration), amended, 135 F.3d 1318 (9th Cir.1998).

Based on the undersigned's consideration of the factors in this case, it is recommended that Defendants' motion for summary judgment on Plaintiff's claim for violation of procedural due process be granted and Plaintiff's claim be dismissed with prejudice.

**(2)     Substantive Due Process**

To the extent Mr. Ayers is challenging the length of time he was kept in the IMU, the undersigned finds that this claim also fails because, as noted above, his placement in the IMU without a hearing was non-punitive.

REPORT AND RECOMMENDATION - 32

Pretrial detainees have a substantive due process right against restrictions that amount to punishment because the State may not impose punishment before an adjudication of guilt. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979).  However, the state may subject pretrial detainees to the "restrictions and conditions of the detention facility," so long as those conditions are not "punitive." *Bell*, 441 U.S. at 536-37.

In determining whether a condition of pretrial detention is punitive, courts follow the standard set by the United States Supreme Court in *Bell v. Wolfish*—whether the condition is "imposed for the purpose of punishment or whether it is but an incident of some legitimate government purpose." *Bell*, 441 U.S. at 538.  The Ninth Circuit refined this standard in *Jones v. Blanas*, in which a convicted sex offender challenged the constitutionality of his administrative segregation in jail while awaiting civil adjudication as a sexually violent predator.  *Jones*, 393 F.3d at 918.  The *Jones* court analyzed the *Bell* pretrial detainee standard, identifying two circumstances indicative of impermissible punishment:

> (1) where the challenged restrictions are expressly intended to punish, or
> (2) where the challenged restrictions serve an alternative, non-punitive purpose but are nonetheless excessive in relation to the alternative purpose, or are employed to achieve objectives that could be accomplished in so many alternative and less harsh methods.

*Jones*, 393 F.3d at 932 (internal quotation marks and further citation omitted).  The *Jones* court further specified three government interests generally considered non-punitive: ensuring a detainee's presence at trial, maintaining jail security, and effective management of a detention facility. *Id*.  In addition, in *Bell*, the United States Supreme Court recognized the importance of allowing detention facility officials the freedom to take appropriate action to ensure the safety of residents and personnel.  *Bell*, 441 U.S at 547.  Therefore, SCC administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in

REPORT AND RECOMMENDATION - 33

their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id*.

As noted above, Mr. Ayers's segregation in SCC's IMU falls squarely within the non-punitive category as he was segregated to ensure the safety and security of SCC residents and staff after his assault of a staff member and continued threats and extreme behaviors. SCC mental health professionals evaluated Mr. Ayers's placement on a regular basis and when they judged him no longer to be a threat to the security of the institution, he was returned to a regular housing unit. ECF No. 116 at ¶ 11.

Accordingly, the undersigned recommends that Defendants' motion for summary judgment on Mr. Ayers's claim that he was denied due process when SCC placed him in the IMU be granted and that this claim be dismissed with prejudice.

## H. Personal Participation – Defendants Denny and Richards

Defendants Denny and Richards argue that the court should dismiss them from this lawsuit because Mr. Ayers has not made any allegations against them. ECF No. 110, p. 26. To sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that he suffered a violation of rights protected by the Constitution or created by federal statute, and (ii) that the violation was proximately caused by a person acting under color of state law. *See Crumpton v. Gates,* 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that caused the alleged deprivation. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

REPORT AND RECOMMENDATION - 34

Supervisory personnel are generally not liable under § 1983 for the actions of their employees. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989) (holding that there is no respondeat superior liability under § 1983). A supervisor is only liable for the constitutional violations of subordinates if the supervisor participated in or directed the violations. *See id*. Knowledge and acquiescence in a subordinate's unconstitutional conduct is insufficient; government officials, regardless of their title, can only be held liable under § 1983 for his or her own conduct and not the conduct of others. *See Ashcroft v. Iqbal*, ---U.S. ----, ----, 129 S. Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). When a defendant holds a supervisory position, the causal link between such defendant and the claimed constitutional violation must be specifically alleged. See *Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir.1979); *Mosher v. Saalfeld*, 589 F.2d 438, 441 (9th Cir.1978). Vague and conclusory allegations concerning the involvement of supervisory personnel in civil rights violations are not sufficient. *See Ivey v. Board of Regents*, 673 F.2d 266, 268 (9th Cir.1982). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Iqbal*, 129 S.Ct. at 1948.

In his Amended Complaint, Mr. Ayers makes no mention of Defendants Richards or Denny except to list them as parties. Mr. Ayers makes no allegation and provides no summary judgment evidence from which it may be inferred that either of these defendants personally participated in a deprivation of his constitutional rights.

Accordingly, the undersigned recommends that Defendants Richards and Denny should be dismissed from this lawsuit.

REPORT AND RECOMMENDATION - 35

**CONCLUSION**

The undersigned recommends that Defendants' second motion for summary judgment (ECF No. 110) be **GRANTED** and that the Plaintiff's remaining claims against the Defendants as discussed herein be **Dismissed with Prejudice.**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **November 26, 2010**, as noted in the caption.


DATED this  4th  day of November, 2010.


Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 36